IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JULIE DOWNS, as Administrator of the Estate of BRIAN DOWNS, and on behalf of his Next of Kin, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. |
| COUNTY OF MORGAN, MIKE CARMODY, Morgan County Sheriff, TIM MEGGINSON, Morgan County Jail Administrator, TREVOR PRATHER, Morgan County Assistant Jail Administrator, KURT BORMAN, COLTON BROWN, DYLAN BUNFILL, K.W. CREWS, J. GILL, L. HART, IAN HAYES, ADAM HILLIS, AUSTEN MANLEY, and CLAYTON SEXTON, Morgan County Corrections Officers, | ) ) ) ) ) ) ) ) ) ) | **JURY DEMANDED** |
| ADVANCED CORRECTIONAL HEALTHCARE, INC., JESSICA YOUNG, CEO and as President of Advanced Correctional Healthcare, Inc., and KAREN FOWLER, R.N., as Health Services Administrator of Advanced Correctional Healthcare, Inc., MARY DAMBACHER, NP, and DAWN R. GRAHAM, RN, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |
| THE PASSAVANT MEMORIAL AREA HOSPITAL ASSOCIATION, d/b/a JACKSONVILLE MEMORIAL HOSPITAL, HELEN D. KWONG, M.D. | ) ) ) ) | |
| Respondents in Discovery, | ) | |

## COMPLAINT

### I. PRELIMINARY STATEMENT

On Friday, April 22, 2022, Brian Downs (Brian) and his girlfriend were at JB Hawks

located at 205 East Morton, Jacksonville, Illinois.   The manager of the business called the Jacksonville Police Department due to Brian allegedly leaving a syringe in the restroom.   Upon arrival, Jacksonville Police Department Officers Schriber and Radliff immediately recognized Brian from his history of illegal drug use.   Brian was placed under arrest for Resisting or Obstructing a Peace Officer.   Brian was then transported to the Morgan County Detention Facility (MCDF) by Officer Radliff.   Upon arrival at the jail, Brian's behavior was erratic and he was disoriented. The officers recognized that Brian was having severe heroin withdrawals and notified Registered Nurse Dawn R. Graham, to examine him.   RN Graham is the Clinical Director of the Morgan County TB Clinic, and also worked at the jail.   Upon her examination, RN Graham telephoned Nurse Practitioner, Mary Dambacher, an employee of Advanced Correctional Healthcare (ACH), who told her to have Brian transported to the emergency department at Jacksonville Memorial Hospital (JMH) for an evaluation.   Correctional officers followed the advice of medical professionals and transported Brian to JMH.

At the hospital, Brian's blood test revealed the presence of heroin.   Brian was treated with Atavin.   At approximately 7:32 p.m. Brian was discharged per the order of correctional officers, despite the fact that this was against medical advice.   The correctional officers were specifically instructed by the medical professionals to "Return to the ED if [Brian's] "symptoms become worse, has increased confusion, or persistent vomiting."   Upon return to the jail, Brian was placed in a medical holding cell which was equipped with a video camera so staff could purportedly maintain a close watch on the medically vulnerable inmate.

On Saturday, April 23, 2022, at approximately 2:20 p.m.[1], and possibly earlier, Brian's medical condition began to worsen; he began vomiting.  Brian continued to vomit throughout the day and following day.  Over the course of 34 hours, Brian vomited, including blood.  During this time period, no employee of the jail notified a qualified health provider, nor did they transport Brian to the emergency department at JMH.

On April 24, 2022, at approximately 12:24 p.m. the nurse of MCDF, RN Graham, was doing paperwork when Correction Officer Bunfill explained to her that Brian was vomiting and asked if she could go see him.  Upon examination, RN Graham, noted that Brian was having "emesis" and it had a color of yellow and green.  She then phoned NP Dambacher and explained Brian's medical condition.  NP Dambacher ordered Zofran 4 mg, to be taken 2x per day/orally for 3 days, Vistaril 50 mg, to be taken 2x per day/orally for 5 days, Vistaril 25 mg, to be taken 2x per day/orally for 5 days, and Bentyl 20 mg, to be taken 2x per day/orally for 5 days.  At approximately 1:05 p.m., RN Graham gave Brian Bentyl 20 mg, and Vistaril 50 mg with a glass of water.  At approximately 1:10 p.m., she gave him Zofran 4 mg. That was her last contact with Brian throughout his incarceration.  RN Graham did dispense the initial medication to Brian, but records do not reflect that Brian received any further medication.

Upon shift change at 3:00 p.m., arriving CO Manley indicated:

> …that detainee Downs, Brian C DOB 11/16/1981 had been seen by our facility nurse earlier in the day due to him actively withdrawing (sic).  They also informed us that our facility nurse had given him medication and cleared him from needing any further medical attention.

---

[1] The Illinois State Police conducted an investigation into this matter, which included a review of video tape capturing Brian's incarceration.  It is believed that the time stamp on the video is two hours behind the actual time. The dates and times of this complaint reflect the actual estimated time of the occurrence depicted.

At the arrival of the 11:00 p.m. shift, CO Gill (working the 3:00 p.m. to 11:00 p.m.) shift, instructed CO Borman (who was just arriving):

> …that Downs had been seen by MCSO medical staff earlier in the day and was given meds for his condition.   No further actions were to be taken by staff for his medical.   Downs was given a bucket in his cell as he was vomiting throughout the day.

Being so instructed, CO Borman and all other correctional officers did nothing to assist Brian despite his medical emergency.

Deputy T. Griffin, from the Morgan County Sheriff's Department, arrived at the jail at 12:15 a.m. and observed Brian's condition.   He was alarmed and inquired as to why Brian was not receiving medical care.   The jail staff informed him that they could not get an off-duty correctional officer to come to the jail to transport Brian to the hospital. Deputy Griffin expressed alarm at this excuse and immediately drove his patrol car to the sally port in order to transport Brian to JMH.   On April 25, 2022, - three days after his initial admission to the MCDF and approximately 52 hours after being locked in the medical holding cell – Brian collapsed and went into cardiac arrest.   Brian died at the jail and his body was then transported to JMH.     Brian's autopsy determined that he died of dehydration as well as septic shock due to bowel obstruction as a consequence of small bowel intussusception in the setting of opioid withdrawal syndrome.

## II.      JURISDICTION & VENUE

1.      The jurisdiction of the Court is invoked pursuant to the Constitution of the United States; the Civil Rights Act, 42 U.S.C. §1983; the Judicial Code, 28 U.S.C. §§ 1331, 1343(a), and supplementary jurisdiction, as codified in 28 U.S.C. §1367(a).

2.      The violations of civil rights and other misconduct alleged herein occurred

in Jacksonville, Morgan County, Illinois.    Accordingly, this action properly lies in the United States District Court for the Central District of Illinois, Springfield Division, pursuant to 28 U.S.C. § 1391(b).

## III.    THE PARTIES

3.    All relevant times, Brian Downs was a United States citizen and lived in Jacksonville, Morgan County, Illinois.   At the time of his death, Brian Downs was a pre-trial detainee confined in the MCDF.   Brian was 40 years old, never married, had no children, and is survived by his mother, Julie Downs, brother, Brandon Downs, and sister, Brittany Downs.

4.    Plaintiff, Julie Downs, is the mother of the decedent, Brian Downs, and was appointed Administrator of the of the Estate of Brian Downs by the Circuit Court of the Seventh Judicial Circuit in Morgan County Case No. 2023-PR-4.   Plaintiff brings this action in her capacity as Administrator of the Estate of Brian Downs and for the benefit of Brian's next of kin.

### A.    Morgan County, Sheriff, Staff, and Jailers
### (The Morgan County Corrections Defendants)

5.    At all relevant times, Defendant Mike Carmody (Sheriff Carmody) was the duly elected Sheriff of Morgan County and the warden and chief administrator of the MCDF.   Sheriff Carmody was the final policy maker for Defendant Morgan County with respect to the care and custody of inmates in the MCDF.   At all relevant times, Sheriff Carmody acted under color of law.   Sheriff Carmody is sued in his official capacity.

6.    Defendant Jail Administrator Tim Megginson was employed by Morgan County and/or Sheriff Carmody as the Jail Administrator during Brian's incarceration.   JA

Tim Megginson is sued in his individual capacity.

7.     Defendant Assistant Jail Administrator Trevor Prather was employed by Morgan County and/or Sheriff Carmody as the Assistant Jail Administrator during Brian's incarceration.   Assistant JA Trevor Prather is sued in his individual capacity.

8.     Defendant Kurt Borman (CO Borman) was employed by Morgan County and/or Sheriff Carmody as a Corrections Officer working in the MCDF during Brian's incarceration, including on the night he died. CO Borman is sued in his individual capacity.

9.     Defendant Colton Brown (CO Brown) was employed by Morgan County and/or Sheriff Carmody as a Corrections Officer working in the MCDF during Brian's incarceration, including on the night he died.   CO Brown is sued in his individual capacity.

10.     Defendant Dylan Bunfill (CO Bunfill) was employed by Morgan County and/or Sheriff Carmody as a Corrections Officer working in the MCDF during Brian's incarceration.   CO Bunfill is sued in his individual capacity.

11.     Defendant Clayton Sexton (CO Sexton) was employed by Morgan County and/or Sheriff Carmody as a Corrections Officer working in the MCDF during Brian's incarceration, including on the night he died.   CO Sexton is sued in his individual capacity.

12.     Defendant K.W. Crews (CO Crews) was employed by Morgan County and/or Sheriff Carmody as a Corrections Officer working in the MCDF during Brian's incarceration.   CO Crews is sued in his individual capacity.

13.     Defendant J. Gill (CO Gill) was employed by Morgan County and/or Sheriff Carmody as a Corrections Officer working in the MCDF during Brian's incarceration.   CO

Gill is sued in his individual capacity.

14.     Defendant L. Hart (CO Hart) was employed by Morgan County and/or Sheriff Carmody as a Corrections Officer working in the MCDF during Brian's incarceration.   CO Hart is sued in his individual capacity.

15.     Defendant Ian Hayes (CO Hayes) was employed by Morgan County and/or Sheriff Carmody as a Corrections Officer working in the MCDF during Brian's incarceration.   CO Hayes is sued in his individual capacity.

16.     Defendant Adam Hillis (CO Hillis) was employed by Morgan County and/or Sheriff Carmody as a Corrections Officer working in the MCDF during Brian's incarceration.   CO Hillis is sued in his individual capacity.

17.     Defendant Austen Manley (CO Manley) was employed by Morgan County and/or Sheriff Carmody as a Corrections Officer working in the MCDF during Brian's incarceration.   CO Manley is sued in his individual capacity.

18.     At all relevant times, the individual jailer defendants identified above acted under color of law and in the course and scope of his or her employment as employees or agents of Morgan County and/or Sheriff Carmody.

19.     Defendant Morgan County is a governmental entity in the State of Illinois which funds and operates the MCDF and, while Sheriff Carmody may be the actual employer of the individual jailers named herein, Morgan County is a necessary party and is ultimately responsible for paying a judgment or settlement on behalf of the Sheriff or individual jailers and is joined in this action pursuant to *Carver v. Sheriff of LaSalle County,* 324 F.3d 947 (7th Cir. 2003).

**B.    Dawn R. Graham, employed by Morgan County TB Clinic, Nurse (Morgan County Detention Facility – Medical Defendant)**

20.    At all relevant times, Defendant, Dawn R. Graham, Registered Nurse, (RN Graham) was employed by Morgan County and/or Sheriff Carmody in the business of providing healthcare services to inmates incarcerated at the MCDF.   RN Graham was acting under color of law and in the course and scope of her employment with Morgan County and/or Sheriff Carmody.   RN Graham is sued in her individual capacity.

**C.    Advanced Correctional Healthcare, Inc., Physicians and Nurses (Advanced Correctional Healthcare - Medical Defendant)**

21.    At all relevant times, Defendant Advanced Correctional Healthcare, Inc. (ACH) was a corporation located in Franklin, Tennessee, in the business of providing healthcare services to incarcerated inmates.   At all relevant times, ACH provided healthcare to inmates in the MCDF pursuant to a contract with Morgan County and Sheriff Carmody.    At all relevant times, ACH, by and through its employees and agents, was acting under color of law, and its employees and agents were acting in the course and scope of their employment or agency with ACH and/or Morgan County and/or Sheriff Carmody.

22.    At all relevant times, Defendant Jessica Young (CEO & President Young) at Advanced Correctional Healthcare, Inc., was the Chief Executive Officer and President and was responsible for medical healthcare services at MCDF, including providing adequate physician, nurse practitioner or physician assistant staffing.    CEO & President Young was an official policy maker of ACH and Morgan County and/or Sheriff Carmody on all issues relating to the medical healthcare provided to inmates in MCDF.   CEO &

President Young was acting under color of law and in the course and scope of her employment or agency with ACH and Morgan County and/or Sheriff Carmody. CEO & President Young is sued in her official and individual capacities.

23.     At all relevant times, Defendant Karen Fowler (HSA Fowler) was employed by ACH as its Health Services Administrator and Registered Nurse and was responsible for providing medical care to inmates of MCDF.   HSA Fowler was an official policy maker of ACH and/or Morgan County and/or Sheriff Carmody on all issues relating to providing medical care to inmates of MCDF.   HSA Fowler was acting under the color of law and in the course and scope of her employment or agency with ACH and/or Morgan County and/or Sheriff Carmody.   HAS Fowler is sued in her official capacity.

24.     At all relevant times, Defendant Nurse Practitioner Mary Dambacher was employed by ACH as a Nurse Practitioner and was responsible for providing healthcare services to inmates at MCDF.   NP Dambacher was acting under color of law and in the course and scope of her employment or agency with ACH and/or Morgan County and/or Sheriff Carmody.   NP Dambacher is sued in her individual capacity.

**IV.     COMMON ALLEGATIONS OF FACT**

**B.     Advanced Correctional Healthcare, Inc. Is Awarded the "Jail Contract" to Provide Medical Care for MCDF Inmates.**

25.     On February 1, 2022, Morgan County, the Morgan County Sheriff and Advanced Correctional Healthcare, Inc. (ACH) executed an "Agreement for the Provision of Healthcare to Incarcerated Patients Morgan County, Illinois". (the Jail Contract).

26.     The Jail Contract required ACH to provide medical care to MCDF inmates.

27.     The Jail Contract required Morgan County to pay ACH a fixed sum of

$53,040.06 per year.

28.     In the years and months before Brian's April 2022 admission to the MCDF, the abuse of heroin and other opiate-based controlled substances increased dramatically throughout the nation, including Morgan County and surrounding areas.

29.     Reasonably trained corrections staff and medical staff responsible for coordinating access to and providing medical care to inmates housed in local jails were particularly attuned to patterns of heroin and opiate abuse due to the disproportionately high number of heroin and opiate abusers typically present in the correctional population.

30.     Reasonably trained corrections staff and medical staff responsible for coordinating access to and providing medical care to inmates housed in local jails were, likewise, aware of the significant medical issues presented in opiate addicted individuals detoxifying from opiates due to sudden termination of their usage upon admission to a correctional facility.

31.     Inmates undergoing opioid detoxification have serious medical needs.

32.     Opioid detoxification is known to have several harmful and potentially fatal medical consequences, which are particularly likely to be present in persons who are heavy users of opioids.

33.     In the initial phase of opiate detoxification, a patient may experience the following unpleasant withdrawal symptoms: restlessness; agitation; anxiety; myalgia (muscle aches/pains); insomnia; and diaphoresis (sweating).

34.     In the later phase of opiate detoxification, a patient may experience the following more menacing withdrawal symptoms: abdominal cramping; diarrhea; mydriasis

(dilated pupils); horripilation (goose bumps); nausea; and vomiting.

35.     The serious medical consequences present with opioid detoxification include: dehydration; electrolyte imbalance; neurological arrhythmia (seizures); or cardiac arrhythmias leading to cardiac arrest.  The most serious medical consequence from opioid detoxification is death.

36.     For these reasons, recognized standards of correctional healthcare require that persons who are admitted to correctional facilities with obvious signs of opiate abuse be consistently monitored and assessed.

37.     Such monitoring includes assessments multiple times per day of vital signs, including: pulse; respirations; blood pressure; and body temperature.

38.     Such monitoring includes evaluation multiple times per day of symptoms which are consistent with serious health consequences of detoxification, including: abdominal cramping; diarrhea; mydriasis (dilated pupils); horripilation (goose bumps); nausea; vomiting; anxiety; insomnia; sweating; and restlessness.

39.     Close monitoring, regular assessments and continued evaluations of this nature is necessary to ensure that an inmate experiencing opioid detoxification is not at risk of more serious medical consequences, including those outlined above.

40.     Most opioid withdrawal protocols consist of the following measures:

        a.     daily clinic visits by a healthcare provider during the withdrawal period for vital sign assessments, clinical assessments and interviews to assess a patient's withdrawal severity utilizing the Clinical Opiate Withdrawal Scale (COWS), an objective assessment completed by a healthcare provider and the Subjective Opiate

Withdrawal Scale (SOWS);

b.      pharmacological intervention and support measures to assess, monitor and treat the patient's unpleasant and menacing symptoms of detoxification, including anxiety, insomnia, restlessness, agitation, nausea, vomiting, rhinorrhea, or myalgias.

c.      to provide non-pharmacological intervention for signs of dehydration resulting from diarrhea, vomiting and malnutrition; monitoring potential electrolyte imbalances and kidney function with chemical tests on a patient's blood sample; providing supplemental nourishment such as Ensure; and to provide intravenous fluids such as saline to maintain safe levels of hydration.

41.    Morgan County, as an entity that operates a correctional facility and is charged with the responsibility to provide medical care to an inmate population, was aware of the medical issues present in an inmate population and was thus aware of the need for monitoring, assessment and evaluation of persons admitted the correctional facilities with histories of opioid abuse.

42.    Morgan County was aware of the need to establish and follow specific policies, practices, and guidelines for its corrections staff and its medical contractors regarding care for inmates with histories of opiate abuse.

43.    Morgan County was, likewise, aware of the need to supervise, train and discipline its corrections staff and its medical contractors concerning compliance with established policies, practices and guidelines for its corrections staff and medical contractors, including those policies, practices and guidelines regarding care for inmates

with histories of opiate abuse.

44.     The individual Morgan County Corrections Defendants and the individual ACH Defendants were each aware of the need to properly monitor, assess and evaluate persons admitted to MCDF with histories of opioid abuse and the need to provide necessary medical intervention in the event of complications arising from opioid detoxification.

**B.      Brian Was Admitted to MCDF and Corrections and Medical Staff Understood that He Was Experiencing Withdrawal Symptoms from Opiate Use.**

45.     On April 22, 2022, Brian was arrested by the Jacksonville Police Department at a local establishment for discarding a used syringe and displaying signs of intoxication.   Brian was arrested for Resisting or Obstructing a Peace Officer and transported to the MCDF.   It was disclosed to corrections and medical that he suffered from opiod use disorder (OUD) and had previously experienced withdrawal symptoms while detoxifying.

46.     On April 22, 2022, at approximately 2:20 p.m., CO Hart, CO Jackson, and Tim Megginson (JA Megginson) were working at the MCDF.  CO Hart conducted a search of Brian and discovered a small piece of paper with a rock-like substance.   Brian was then escorted to a holding cell to await charges from the Jacksonville Police Department.

47.     On April 22, 2022, at approximately 3:00 p.m., RN Graham was asked by an unnamed correctional officer to check on an inmate (Brian) because he had "injected something and had either passed out or something happened."   RN Graham is the

clinical director of Tuberculosis (TB) Clinic for Morgan County and provided healthcare services at MCDF.

48.     Upon examination, RN Graham indicated that Brian told her that he had injected heroin (2-3 hours ago) and was complaining about muscle spasms and irritability.

49.     On April 22, 2022, at approximately 3:05 p.m., RN Graham contacted NP Dambacher by telephone and was instructed to send Brian to the Emergency Room for evaluation.   RN Graham notified the jail administration of the orders.

50.     On April 22, 2022, at approximately 4:20 p.m., CO Crews transported Brian to Jacksonville Memorial Hospital, stated that he secured Brian to the hospital bed with 2-point restraints, and that Brian was in a very excited state of mind and was sweating profusely.

51.     Brian was treated by Dr. Helen D. Kwong at JMH with Atavin.   Against medical advice, MCDF employees took custody of Brian and transported him back to MCDF at approximately 8:00 p.m. Staff at JMH instructed that Brian was to be immediately transported back to the hospital if his symptoms "become worse, have increased confusion or persistent vomiting."

52.     On April 23, 2022, at approximately 2:26 p.m. CO Hayes and Jail Administrator Prather escorted Brian into the booking room to complete the booking process.   Brian then asked, "is there any way we can do this a little bit later, I just want to lay down."   They escorted Brian back to Holding Cell #2.   A few moments later, Brian knocked on the door and CO Hayes went to see what Brian needed.   CO Hayes indicated that Brian did not speak but looked as if he were going to vomit.   CO Hayes quickly

unlocked the door and escorted Brian back into booking so he could vomit in the trash can. It appears that this was the first documented time Brian vomited during his incarceration.

53. On April 23, 2022, Brian continued to vomit and/or spit what appears to be liquid which is yellowish in color from 10:30 p.m. until 12:00 a.m. for a total of 2 times.

54. On April 24, 2022, Brian continued to vomit and/or spit what appears to be liquid which is yellowish in color from 12:00 a.m. until approximately 4:00 a.m., for a total of 11 times.

55. On April 24, 2022, Brian continued to vomit and/or spit, what now appears to be blood, from approximately 4:00 a.m. to approximately 7:48 a.m., for a total of 16 times.

56. At approximately 4:53 a.m., two jailers came to Brian's cell and mopped the blood on the floor.

57. On April 24, 2022, Brian continued to vomit blood and/or spit from 7:48 a.m. until approximately 12:24 p.m., for a total of 17 times.

58. At approximately 12:24 p.m. a correctional officer and Jail Trustee Joshua Wilson again mopped the blood off of the cell floor.

59. Also, at approximately 12:24 p.m. RN Graham arrived and does an assessment of Brian. She exited the cell for a few minutes and returned to take his blood pressure. RN Graham then exited Brian's cell.

60. After her examination, RN Graham phoned NP Dambacher and explained Brian's medical condition.

61.     NP Dambacher ordered Zofran 4 mg, to be taken 2x per day/orally for 3 days, Vistaril 50 mg, to be taken 2x per day/orally for 5 days, Vistaril 25 mg, to be taken 2x per day/orally for 5 days, and Bentyl 20 mg, to be taken 2x per day/orally for 5 days.

62.     At approximately 1:05 p.m., RN Graham returned to Brian's cell and gave Brian Bentyl and Vistaril with a glass of water.

63.     At approximately 1:10 p.m., RN then gave Brian Zofran. That was her last contact with Brian throughout his incarceration.

64.     On April 24, 2022, Brian continued to vomit and/or spit blood from approximately 12:35 p.m. until 7:35 p.m. for a total of 48 times.

65.     On April 24, 2022, CO Manley arrived at the MCDF for his 3:00 p.m. to 11:00 p.m. shift and was advised from the prior shift (7:00 a.m. to 3:00 p.m.):

    ….that detainee Downs, Brian C DOB 11/16/1981 had been seen by our facility nurse earlier in the day due to him actively withdrawing.   They also informed us that our facility nurse had given him medication and cleared him from needing any further medical attention.

66.     On April 24, 2022, CO Borman arrived at the MCDF for his 11:00 p.m. to 7:00 a.m. shift.   He relieved CO Gill in the control room and was verbally briefed:

    …that Downs had been seen by MCSO medical staff earlier in the day and was given meds for his condition.   No further actions were to be taken by staff for his medical.   Downs was given a bucket in his cell as he was vomiting throughout the day.

67.     On April 24, 2022, at approximately 7:35 p.m. a correctional officer opened the door and Brian exited the cell.   Another correctional officer entered the cell holding his nose.   Trustee Wilson looked in the cell and left to retrieve a mop and bucket and began mopping blood from the cell.   Trustee Wilson then removed the garbage bag from

the trash can (which appeared to be heavy), and continued to mop the blood from the floor; he sprayed the cell with Lysol.

68.     Brian then returned to the cell appearing to have showered.

69.     On April 24, 2022, Brian began to vomit and/or spit from approximately 8:00 p.m. until 10:40 p.m. for a total of 32 times.

70.     On April 25, 2022, at approximately 12:05 a.m.[2]   Brian is seen being escorted to the MCDF booking area by a corrections officer.

71.     On April 25, 2022, at approximately 12:07 a.m., Brian collapses and falls down.   Two corrections officers assist in getting him up.

72.     On April 25, 2022, at approximately 12:08 a.m., Brian collapses again and the two corrections officers place him on the floor; one corrections officer leaves to retrieve the wheelchair.   As they are placing Brian in the wheelchair, he falls again.

73.     One of corrections officer exits the view of the camera.   The other corrections officer is standing at the end of the counter, doing nothing.   Brian remains slouched in a wheelchair and is experiencing labored breathing.

74.     On April 25, 2022, at approximately 12:10 a.m., the corrections officer standing at the end of the counter then exits the view of the camera.

75.     On April 25, 2022, at approximately 12:12 a.m. a corrections officer walks over, appears to check on Brian, and then is out of view of the camera.   The other corrections officer returns to the end of the counter and watches Brian as he remains

---

2 The time stamp on the booking room video appear to be 1 hour behind the actual time.   The dates and times of this complaint reflect the actual estimated time of the occurrence. Paragraphs 64-89 describe in present tense the events as depicted in the video.

slouched in the wheelchair and experiencing labored breathing.

76.     On April 25, 2022, at approximately 12:14 a.m. the corrections officer that was leaning against the counter exits the view of the camera.   Brian remains slouched in a wheelchair and is experiencing labored breathing.

77.     On April 25, 2022, at approximately 12:17 a.m., Deputy Griffin, from the Morgan County Sheriff's Department, enters the booking room and approaches Brian, grabs a garbage can, and stands next to Brian.

78.     On April 25, 2022, at approximately 12:18 a.m., the corrections officer returns to the end of the counter, and Deputy Griffin exits the view of the camera.

79.     On April 25, 2022, at approximately 12:19 a.m., a corrections officer exits the view of the camera and returns in a few short seconds.   Deputy Griffin returns and moves the garbage can to the side of Brian. Brian raises his head.   Deputy Griffin goes behind the wheelchair and looks under the wheelchair. Another corrections officer arrives and goes behind the wheelchair, looks under the wheelchair, and turns on a flashlight.

80.     On April 25, 2022, at approximately 12:21 a.m., Brian sits up in the wheelchair and Deputy Griffin washes his hands.

81.     On April 25, 2022, at approximately 12:22 a.m., Brian takes his shirt off and is leaning with his elbows on his knees.   One of the corrections officer and Deputy Griffin exit the view of the camera.   The other corrections officer remains leaning up against the counter.

82.     On April 25, 2022, at approximately 12:23 a.m., Deputy Griffin gives Brian a glass of water.   Brian pours the water over his head, and then takes a drink.   He sits

back in the wheelchair and is wiping the water from his head; he continues to drink from the glass.

83.     On April 25, 2022, at approximately 12:24 a.m., Brian sits up and places his elbows on his knees; he takes another drink.

84.     On April 25, 2022, at approximately 12:25 a.m., Deputy Griffin exits the view of the camera; a few seconds later, the corrections officer exits the view of the camera.

85.     At that same time, Brian stands up, pulls his pants down, and sits back down in the wheelchair.   Two corrections officers come in view of the camera. The two corrections officers get Brian out of the wheelchair, Brian puts his pants back on, and Brian puts his head down on the counter.    The two correctional officers escort Brian down the hall and out of view of the camera.

86.     On April 25, 2022, at approximately 12:27 a.m., one corrections officer returns to the booking room and goes behind the counter as if he were looking for something.   He returns down the hallway and helps another corrections officer escort Brian back to the wheelchair.

87.     On April 25, 2022, at approximately 12:29 a.m., one corrections officer exits the view of the camera and one remains at the end of the counter.   Brian is sitting in the wheelchair and cannot sit still.   The corrections officer that was at the end of the counter walks over to Brian. Brian's head is moving back and forth, Brian tilts his head back.   The other corrections officer comes back in view of the camera.

88.     On April 25, 2022, at approximately 12:31 a.m., both corrections officers exit the view of the camera and return a few short seconds later.   They both lift Brian up

from the wheelchair (Brian's body appears to be straight).    One corrections officer checks for a pulse and leaves the view of the camera.    The other corrections officer remains with Brian.

89.     On April 25, 2022, at approximately 12:34 a.m., a corrections officer comes in view of camera, walks over to Brian, and nudges his foot.

90.     On April 24, 2022, at approximately 12:34 a.m., Deputy Griffin arrives, and appears to use his police radio.

91.     Another corrections officer arrives, goes over to Brian, and then exits view of the camera.

92.     On April 24, 2022, at approximately 12:35 a.m., Deputy Griffin and the 3 corrections officers remove Brian from the wheelchair and place him on the floor; one corrections officer begins CPR.

93.     On April 24, 2022, at approximately 12:36 a.m., they administer an AED shock (2 or 3 times); they restart CPR.

94.     On April 24, 2022, at approximately 12:39 a.m., EMS arrive and take control of emergency CPR.

95.     On April 24, 2022, at approximately 12:55 a.m., EMS remove Brian's body from the facility.

96.     During his incarceration, Brian mostly vomited and/or sometimes spit-up over 100 times in a span of at least 34 hours, causing his death.

## V. CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983 - 14th Amendment - Denial of Medical Care - Individual Liability (Morgan County Custodial Defendants, Advance Correctional Healthcare Defendants and Nurses)

97.     At all relevant times, Plaintiff's decedent, Brian Downs, had a constitutionally protected right under the Fourteenth Amendment to the United States Constitution to receive needed care while in the MCDF, and to have his health monitored and his medical issues timely and properly assessed and treated.

98.     Jail Administrator Tim Megginson and Assistant Jail Administrator Trevor Prather acted under color of law.

99.     Defendants, CO Borman, CO Brown, CO Bunfill, CO Crews, CO Gill, CO Hart, CO Hayes, CO Hillis, CO Manley, and CO Sexton, acted under color of law.

100.    Defendants, Nurse Graham and NP Dambacher, acted under color of state law.   Each were private individuals acting under a contract with the County and/or Sheriff Carmody to perform a traditional and statutorily required governmental function.

101.    These defendants were deliberately indifferent to Brian's serious medical needs and thereby deprived Brian of his constitutional right to due process of law guaranteed by the Fourteenth Amendment to the Unites States Constitution.

102.    Brian suffered from both a objectively and subjectively substantial risk of serious harm while under the custody and care of these defendants, who responded to this risk in an objectively and subjectively unreasonable manner.

WHEREFORE, Plaintiff prays for judgment as noted below.

## COUNT II
### 42 U.S.C. § 1983 - 14th Amendment - Denial of Medical Care – *Monell Claim* (Morgan County and/or Sheriff Carmody)

103.    The violation of Brian Downs' rights under the Fourteenth Amendment to the United States Constitution, Plaintiff's damages, and the conduct of the Morgan County Custodial and Medical Defendants and Advanced Correctional Healthcare Defendants, were directly and proximately caused by the actions and/or inactions of the Defendant Morgan County and/or Sheriff Carmody, which, with deliberate indifference:

 a. failed to ensure through proper training, supervision and discipline of corrections staff or termination of medical staff that corrections staff and medical staff complied with established policies, practices and procedures for addressing the serious medical needs of inmates at MCDF, such as Brian, who are undergoing detoxification from opioids;

 b. acquiesced or deliberately denied Brian emergency medical care while he was vomiting and spitting up blood for 34 hours, despite the obvious need for medical care.

 c. failed to ensure through training, supervision and discipline of corrections staff and medical staff that corrections staff and medical staff adequately communicate and document an inmate's deteriorating medical health condition;

 d. failed to ensure, through training, supervision and discipline of corrections staff and medical staff, that corrections staff and medical

staff properly respond to an inmate's deteriorating medical health condition;

e.     failed to contract for healthcare services in a manner that financial incentives would not affect reasonable medical judgment, and deter medical corrections staff or medical staff from calling on-call healthcare providers, requesting on-call providers to return to the facility after hours for medical emergencies, or for calling outside non-contract emergency services; and

f.     failed to provide or otherwise effectively manage a medication assistance treatment program for inmates at MCDF, such as Brian, who are undergoing detoxification from opioids.

WHEREFORE, Plaintiff prays for judgment as noted below.

## COUNT III
## 42 U.S.C. § 1983 - 14th Amendment - Denial of Medical Care – *Monell Claim*
## (Advanced Correctional Healthcare)

104.   The violation of Brian Downs' rights under the Fourteenth Amendment to the United States Constitution, Plaintiff's damages, and the conduct of the individual Morgan County Corrections and Medical Defendants and Individual Advanced Correctional Healthcare Defendants was directly and proximately caused by the actions and/or inactions of the Defendant Advanced Correctional, which, with deliberate indifference:

a.     failed to ensure through proper training, supervision and discipline that the individual corrections staff and medical staff complied with

established policies, practices and procedures for addressing the serious medical needs of inmates at MCDF, such as Brian, who are undergoing detoxification from opioids;

b.      acquiesced in the widespread practice and/or office policy at MCDF for corrections officers or medical staff to not contact on call and other medical providers or call for emergency medical services on behalf of an inmate experiencing an obvious medical emergency;

c.      failed to adequately monitor the deteriorating medical health of inmates;

d.      failed to ensure, through training, supervision and discipline of corrections staff or medical staff, that corrections staff and medical staff adequately communicate and document an inmate's deteriorating medical health condition;

e.      failed to ensure through training, supervision and discipline of corrections staff and medical staff, that corrections staff and medical staff properly respond to an inmate's deteriorating medical health condition;

f.      failed to contract for healthcare services in a manner that financial incentives would not affect reasonable medical judgment, and deter medical corrections staff or medical staff from calling on-call and other healthcare providers, requesting on-call and other medical providers to return to the facility after hours for medical emergencies,

or for calling outside non-contract emergency services; and

g.      failed to train corrections or medical staff or provide staff or otherwise effectively manage a medicated assistance treatment program for inmates at MCDF, such as Brian, who are undergoing detoxification from opioids.

WHEREFORE, Plaintiff prays for judgment as noted below.

## COUNT IV
### State Law Claim – Survival – Willful & Wanton Conduct
### (Morgan County/Sheriff Carmody, Individual Morgan County Custodial Defendants)

105.    Plaintiff, Julie Downs, is the Administrator or the Estate of Brian Downs, and brings this action pursuant to the Survival Act, 755 ILCS 5/27-6.

106.    Defendants Morgan County and/or Defendant Sheriff Carmody, acting through its employees, including but not limited to: Jail Administrator Tim Megginson, Assistant Jail Administrator Trevor Prather, Defendants CO Borman, CO Brown, CO Bunfill, CO Crews, CO Gill, CO Hart, CO Hayes, CO Hillis, CO Manley, and CO Sexton, owed a duty to provide access to competent medical care to treat the serious medical needs of pre-trial detainees housed in the MCDF, including Brian.

107.    The Morgan County Custodial Defendants breached the aforesaid duty in the following manner:

a.      willfully and wantonly failed to monitor or assess Brian in order to address his withdrawal symptoms while detoxifying;

b.      willfully and wantonly failed to monitor Brian's intake of nutrition and hydration while he was detoxifying;

c.  willfully and wantonly failed to communicate and document Brian's deteriorating medical condition and the severity of his withdrawal symptoms while detoxifying;

d.  willfully and wantonly failed to properly respond to Brian's deteriorating medical condition in light of the increasing severity of his withdrawal symptoms while detoxifying;

e.  willfully and wantonly failed to properly communicate to on-site medical providers or contact on-call, off-site Advanced Correctional Healthcare providers to report Brian's deteriorating medical condition and the increasing severity of his withdrawal symptoms while detoxifying;

f.  willfully and wantonly failed to recognize that the severity of Brian's withdrawal symptoms while detoxifying from opioids could not be properly managed in the MCDF;

g.  willfully and wantonly failed to recognize that the severity of Brian's withdrawal symptoms while detoxifying from opioids should be managed in a hospital setting by a qualified medical provider; and

h.  willfully and wantonly failed to call emergency transport or transfer Brian to a hospital to receive timely and necessary treatment as he became critically ill while detoxifying from opioids.

108.  As a direct and proximate result of one or more of the aforesaid wilfull or wanton acts or omissions, Brian died on April 25, 2022.

109.   As a direct and proximate result of the aforesaid, Brian suffered injuries of a personal and pecuniary nature, including, but not limited to pain and suffering, and physical and emotional trauma, all of which continued until his death and contributed to cause his death on April 25, 2022, and had he survived he would have been entitled to bring an action for the damages, and said action has survived him pursuant to the Illinois Survival Act.

WHEREFORE, Plaintiff prays for judgment as noted below.

## COUNT V
### State Law Claim – Wrongful Death – Wilful & Wanton Conduct
**(Morgan County/Sheriff Carmody Individual Morgan County Custodial Defendants)**

110.   Plaintiff, Julie Downs, is the Administrator or the Estate of Brian Downs, and brings this action on behalf of Brian Downs' next of kin pursuant to the Wrongful Death Act, 740 ILCS 180/1.

111.   Defendants Morgan County and/or Defendant Sheriff Carmody, acting through its employees, including but not limited to: Jail Administrator Tim Megginson, Assistant Jail Administrator Trevor Prather, Defendants CO Borman, CO Brown, CO Bunfill, CO Crews, CO Gill, CO Hart, CO Hayes, CO Hillis, CO Manley, and CO Sexton; owed a duty to provide access to competent medical care to treat the serious medical needs of pre-trial detainees housed in the MCDF, including Brian.

112.   The Morgan County Custodial Defendants breached the aforesaid duty, in the following manner:

> a.   willfully and wantonly failed to monitor or assess Brian in order to address his withdrawal symptoms while detoxifying;

b.    willfully and wantonly failed to monitor Brian's intake of nutrition and hydration while his was detoxifying;

c.    willfully and wantonly failed to communicate and document Brian's deteriorating medical condition and the severity of his withdrawal symptoms while detoxifying;

d.    willfully and wantonly failed to properly respond to Brian's deteriorating medical condition in light of the increasing severity of his withdrawal symptoms while detoxifying;

e.    willfully and wantonly failed to properly communicate to on-site medical providers or contact on-call, off-site Advanced Correctional Healthcare providers to report Brian's deteriorating medical condition and the increasing severity of his withdrawal symptoms while detoxifying;

f.    willfully and wantonly failed to recognize that the severity of Brian's withdrawal symptoms while detoxifying from opioids could not be properly managed in the MCDF;

g.    willfully and wantonly failed to recognize that the severity of Brian's withdrawal symptoms while detoxifying from opioids should be managed in a hospital setting by a qualified medical provider; and

h.    willfully and wantonly failed to call emergency transport or transfer Brian to a hospital to receive timely and necessary treatment as he became critically ill while detoxifying from opioids.

113.    As a direct and proximate result of one or more of the aforesaid wilful or wanton acts or omissions, Brian died on April 25, 2022.

114.    As a direct and proximate result of Brian Downs' death, his next of kin have lost and will continue to lose a substantial pecuniary support, consortium, society companionship, and the love and affection of their brother, and are entitled to recovery under this Act.

WHEREFORE, Plaintiff prays for judgment as noted below.

### COUNT VI
**State Law Claim – Survival    – Institutional Negligence**
**(Advanced Correctional Healthcare)**

115.    Plaintiff, Julie Downs, is the Administrator or the Estate of Brian Downs, and brings this action pursuant to the Survival Act, 755 ILCS 5/27-6.

116.    At all relevant times, Advanced Correctional Healthcare had an independent duty and/or voluntary and jointly assumed the non-delegable duty of the Morgan County and the Morgan County Sheriff to provide medical care to inmates of the MCDF, including:

      a.     a duty to manage and provide on-site and telemedicine healthcare services for the inmates/detainees at the MCDF;

      b.     a duty to provide sufficient staffing of qualified medical practitioners, and appropriate supervision of medical staff, to effectively manage and operate a medicated assisted treatment program;

      c.     a duty to follow the medical policies and procedures set forth by Morgan County (which Advanced Correctional Healthcare

determined to be written in accordance with current National Standards of Correctional Health); the standards set forth in the County Jail Act, 730 ILCS 125/0.01, et seq.; and the regulations set forth in 20 Ill. Admin. Code 701.90.

d.  a duty to provide medical and support staff trained in accordance with NCCHC (National Commission on Correctional Healthcare).

117. At all relevant times, Advanced Correctional Healthcare had an independent duty and/or voluntary and jointly assumed the non-delegable duty of the Morgan County and the Morgan County Sheriff to provide administrative services to ensure proper medical care to inmates of MCDF, including:

a.  a duty to provide quarterly reports to the Morgan County Sheriff or his designee concerning the overall health care services program and the general health of the persons committed to the jail, including: the number of medical requests received; the number of medical visits; the number of unique inmates seen; the longest length of time between a request and a visit; the number of off-site visits to specialists; and the number of off-site emergency room visits;

b.   a duty to meet quarterly with the Morgan County Sheriff or his designee concerning procedures within the jail and any proposed changes in health-related procedures;

c.  a duty to establish a training program for the Morgan County jailers.

118. Defendant Advanced Correctional Healthcare breached one or more of the

aforesaid duties in one or more of the following manners:

    a.    negligently and carelessly provided and managed the healthcare delivery system provided to the MCDF in that it incentivized nurses to act outside the scope of their qualifications;

    b.    negligently and carelessly managed the healthcare delivery system provided to the MCDF in that it disincentivized nursing staff from objectively communicating an inmate's condition to on-call medical providers;

    c.    negligently and carelessly managed the healthcare delivery system provided to MCDF in that it disincentivized nursing staff from recommending or requesting that the on-call medical provider go to the MCDF to provide after hour medical services;

    d.    negligently and carelessly managed the healthcare delivery system provided to the MCDF in that it disincentivized nursing staff from recommending or requesting that an inmate be sent to the emergency room;

    e.    negligently and carelessly managed a medication assistance treatment and failed to staff such program with sufficient, properly trained, and qualified medical practitioners;

    f.    negligently failed to submit quarterly written healthcare reports or meet with the Morgan County Sheriff to evaluate or discuss improvements or changes in health-related procedures; and

g.      negligently and carelessly failed to establish a training program for the County Deputies and Jailers.

119.   The injuries and death suffered by Brian were proximately caused by the negligence, breach of duty of the standard of care, neglect, default, and /or willful and wanton conduct of the Defendant Advanced Correctional Healthcare as described above.

120.   As a direct and proximate result of the aforesaid, Brian suffered injuries of a personal and pecuniary nature, including, but not limited to pain and suffering, and physical and emotional trauma, all of which continued until his death and contributed to cause his death on April 25, 2022, and had he survived he would have been entitled to bring an action for the damages and said action has survived him pursuant to the Illinois Survival Act.

WHEREFORE, Plaintiff prays for judgment as noted below.

**COUNT VII**
**State Law Claim – Wrongful Death   – Institutional Negligence**
**(Advanced Correctional Healthcare)**

121.   Plaintiff, Julie Downs, is the Administrator or the Estate of Brian Downs, and brings this action on behalf of Brian Downs' next of kin pursuant to the Wrongful Death Act, 740 ILCS 180/1.

122.   Advanced Correctional Healthcare had an independent duty and/or voluntary and jointly assumed the non-delegable duty of the Morgan County and the Morgan County Sheriff to provide medical care to inmates of the MCDF, including:

a.      a duty to manage and provide on-site and telemedicine healthcare services for the inmates/detainees at the MCDF;

b.    a duty to provide sufficient staffing of qualified medical practitioners, and appropriate supervision of medical staff, to effectively manage and operate a medication assisted treatment program;

c.    a duty to follow the medical policies and procedures set forth by Morgan County (which Advanced Correctional Healthcare determined to be written in accordance with current National Standards of Correctional Health); the standards set forth in the County Jail Act, 730 ILCS 125/0.01, et seq.; and the regulations set forth in 20 Ill. Admin. Code 701.90; and

d.    a duty to provide medical and support staff trained in accordance with NCCHC (National Commission on Correctional Healthcare).

123.  At all relevant times, Advanced Correctional Healthcare had an independent duty and/or voluntary and jointly assumed the non-delegable duty of the Morgan County and the Morgan County Sheriff, to provide administrative services to ensure proper medical care to inmates of MCDF, including:

a.    a duty to provide quarterly reports to the Morgan County Sheriff or his designee concerning the overall health care services program and the general health of the persons committed to the jail, including: the number of medical requests received; the number of medical visits; the number of unique inmates seen; the longest length of time between a request and a visit; the number of off-site visits to specialists; and the number of off-site emergency room visits;

b.     a duty to meet quarterly with the Morgan County Sheriff or his designee concerning procedures within the Jail and any proposed changes in health-related procedures;

c.     a duty to establish a training program for the Morgan County jailers.

124.   Defendant Advanced Correctional Healthcare breached one or more of the aforesaid duties in one or more of the following manners:

a.     negligently and carelessly provided and managed the healthcare delivery system provided to the MCDF in that it incentivized nurses to act outside the scope of their qualifications;

b.     negligently and carelessly managed the healthcare delivery system provided to the MCDF in that it disincentivized nursing staff from objectively communicating an inmate's condition to on-call medical providers;

c.     negligently and carelessly managed the healthcare delivery system provided to MCDF in that it disincentivized nursing staff from recommending or requesting that the on-call medical provider go to the MCDF to provide after hour medical services;

d.     negligently and carelessly managed the healthcare delivery system provided to the MCDF in that it disincentivized nursing staff from recommending or requesting that an inmate be sent to the emergency room;

e.     negligently and carelessly managed a medication assistance

treatment and failed to staff such program, with sufficient, properly trained, and qualified medical practitioners;

f.     negligently failed to submit quarterly written healthcare reports or meet with the Morgan County Sheriff to evaluate or discuss improvements or changes in health-related procedures; and

g.     negligently and carelessly failed to establish a training program for the County Deputies and Jailers.

125.   The injuries and death suffered by Brian were proximately caused by the negligence, breach of duty of the standard of care, neglect, default, and/or willful and wanton conduct of the Defendants as described above.

126.   As a direct and proximate result of Brian's death, his next of kin have lost and will continue to lose a substantial pecuniary support, consortium, society companionship, and the love and affection of their brother, and are entitled to recovery under this Act.

WHEREFORE, Plaintiff prays for judgment as noted below.

**COUNT VIII**
**State Law Claim – Survival   – Medical Malpractice**
**(Advanced Correctional Healthcare and the Individual Medical Defendants)**

127.   Plaintiff, Julie Downs, is the Administrator or the Estate of Brian Downs, and brings this action pursuant to the Survival Act, 755 ILCS 5/27-6.

128.   Plaintiff attached hereto an affidavit in compliance with 735 ILCS 5/2-622(a)(2).

129.   Defendant Advanced Correctional Healthcare, acting through its

Page 35 of 48

employees, NP Dambacher, identified above, and NP Dambacher, individually, and Morgan County employee RN Graham, owed a duty to exercise reasonable care according to the conditions known to them or that, through reasonable care should have been known to them, in accordance with standards of care in the community of nurses, for NP Dambacher and RN Graham.

130.   The foregoing Medical Defendants breached the aforesaid duty to Brian Downs to exercise reasonable care according to the conditions known to them or that, through reasonable care, should have been known to them, in accordance with the standards of their respective professional communities.

131.   Defendant NP Dambacher was negligent and deviated from the standard of care in one or more of the following ways:

    a.    negligently and carelessly failed to adequately review Brian's history in order to properly assess the severity and duration of his withdrawal symptoms during his detoxification;

    b.    negligently and carelessly failed to conduct any follow-up to ensure that Brian was receiving adequate care after having been told that Brian was actively withdrawing during opioid detoxification;

    c.    negligently and carelessly failed to personally assess or provide for a personal assessment by a qualified physician after Brian's medical condition worsened;

    d.    negligently and carelessly failed to personally assess Brian's medical condition after receiving notice of his serious medical needs;

e.   negligently and carelessly failed to instruct the nursing staff on-site at the MCDF to seek emergency medical attention to treat Brian's serious medical needs;

f.   negligently and carelessly failed to instruct the nursing staff to transport Brian to the hospital;

g.   negligently and carelessly failed to recognize that Brian's deteriorating medical condition, as evidenced by the severity of his withdrawal symptoms while detoxifying from opioids, could not be properly managed outside a hospital;

h.   negligently and carelessly failed to properly call for emergency transport or obtain other emergency care for Brian in order for him to receive timely and necessary treatment as he became critically ill while detoxifying from opioids.

i.   failed to adequately document in the medical records or otherwise communicate to on call physicians, other medical professionals, or on-site nursing staff the nature and extent of Brian's serious medical needs; and

j.   failed to adequately monitor or document Brian's medical condition after he was placed in the medical holding cell, including monitoring his vital signs, loss of hydration, and electrolytes, due to vomiting.

132.   Defendant RN Graham was negligent and deviated from the standard of care in one or more of the following ways

a.  negligently and carelessly failed to adequately document in the medical records or otherwise communicate to on call physicians or on call nursing staff the nature and extent of Brian's serious medical needs;

b.  negligently and carelessly failed to properly screen Brian in order to anticipate the serious medical needs he would experience while detoxifying from opioids;

c.  negligently and carelessly failed to properly assess Brian to evaluate the severity of his withdrawal symptoms while detoxifying from opioids;

d.  negligently and carelessly failed to monitor Brian in order to treat his withdrawal symptoms while detoxifying from opioids;

e.  negligently and carelessly failed to monitor Brian's intake of nutrition and hydration while he was detoxifying from opioids;

f.  negligently and carelessly failed to communicate and document Brian's deteriorating medical condition and the severity of his withdrawal symptoms while detoxifying from opioids;

g.  negligently and carelessly failed to properly respond to Brian's deteriorating medical condition in light of the increasing severity of his withdrawal symptoms while detoxifying from opioids;

h.  negligently and carelessly failed to properly communicate to Advanced Correctional Healthcare medical providers or otherwise

arrange for appropriate medical care to report Brian's deteriorating medical condition and the increasing severity of his withdrawal symptoms while detoxifying from opioids;

i.    negligently and carelessly failed to recognize that Brian's deteriorating medical condition, as evidenced by the increasing severity of his withdrawal symptoms while detoxifying from opioids, could not be properly managed outside of a hospital; and

j.    negligently and carelessly failed to properly call for emergency transport or obtain other emergency care for Brian in order for him to receive timely and necessary treatment as he became critically ill while detoxifying from opioids.

133.   The injuries and death suffered by Brian were proximately caused by the negligence, breach of duty of the standard of care, neglect, default, and /or willful and wanton conduct of the Defendants as described above.

134.   As a direct and proximate result of the aforesaid, Brian suffered injuries of a personal and pecuniary nature, including, but not limited to, pain and suffering, and physical and emotional trauma, all of which continued until his death and contributed to cause his death on April 25, 2022, and had he survived he would have been entitled to bring an action for the damages and said action has survived him pursuant to the Illinois Survival Act.

WHEREFORE, Plaintiff prays for judgment as noted below.

## COUNT IX
### State Law Claim – Wrongful Death   – Healing Art Malpractice
### (Advanced Correctional Healthcare and the Individual Medical Defendant)

135.    Plaintiff, Julie Downs, is the Administrator or the Estate of Brian Downs, and brings this action on behalf of Brian Downs' next of kin pursuant to the Wrongful Death Act, 740 ILCS 180/1.

136.    Plaintiff attached hereto an affidavit in compliance with 735 ILCS 5/2-622(a)(2).

137.    Defendant Advanced Correctional Healthcare, acting through its employees, NP Dambacher, identified above, and NP Dambacher, individually, and Morgan County employee RN Graham, owed a duty to exercise reasonable care according to the conditions known to them or that, through reasonable care should have been known to them, in accordance with standards of care in the community of nurses for NP Dambacher and RN Graham.

138.    The foregoing Medical Defendants breached the aforesaid duty to Brian Downs to exercise reasonable care according to the conditions known to them or that, through reasonable care, should have been known to them, in accordance with the standards of care in their respective professional communities.

139.    Defendant NP Dambacher was negligent and deviated from the standard of care in one or more of the following ways.

        a.    negligently and carelessly failed to adequately review Brian's history in order to properly assess the severity and duration of his withdrawal symptoms during his detoxification;

b.      negligently and carelessly failed to conduct any follow-up to ensure that Brian was receiving adequate care after having been told that Brian was actively withdrawing during opioid detoxification;

c.      negligently and carelessly failed to personally assess or provide for a personal assessment by a qualified physician after Brian's medical condition worsened;

d.      negligently and carelessly failed to personally assess Brian's medical condition after receiving notice of his serious medical needs;

e.      negligently and carelessly failed to instruct the nursing staff on-site at the MCDF to seek emergency medical attention to treat Brian's serious medical needs; and

f.      negligently and carelessly failed to instruct the nursing staff to transport Brian to the hospital.

g.      negligently and carelessly negligently and carelessly failed to recognize that Brian's deteriorating medical condition, as evidenced by the severity of his withdrawal symptoms while detoxifying from opioids, could not be properly managed outside a hospital; and

h.      negligently and carelessly failed to properly call for emergency transport or obtain other emergency care for Brian in order for him to receive timely and necessary treatment as he became critically ill while detoxifying from opioids.

i.      negligently and carelessly failed to adequately document in the

medical records or otherwise communicate to on call physicians, other medical professionals, or on-site nursing staff the nature and extent of Brian's serious medical needs; and

j.　negligently and carelessly failed to adequately monitor or document Brian's medical condition after he was placed in the medical holding cell, including monitoring his vital signs, loss of hydration, and electrolytes due to vomiting.

140.　Defendant RN Graham was negligent and deviated from the standard of care in one or more of the following ways.

a.　negligently and carelessly failed to adequately document in the medical records or otherwise communicate to on call physicians or on call nursing staff the nature and extent of Brian's serious medical needs;

b.　negligently and carelessly failed to adequately monitor or document Brian's medical condition which necessitated being placed in a medical cell, including monitoring his vital signs, because of loss of hydration and electrolytes due to vomiting;

c.　negligently and carelessly failed to properly screen Brian in order to anticipate the serious medical needs he would experience while detoxifying from opioids;

d.　negligently and carelessly failed to properly assess Brian to evaluate the severity of his withdrawal symptoms while detoxifying from

opioids;

e.      negligently and carelessly failed to monitor Brian in order to treat his withdrawal symptoms while detoxifying from opioids;

f.      negligently and carelessly failed to monitor Brian's intake of nutrition and hydration while he was detoxifying from opioids;

g.      negligently and carelessly failed to communicate and document Brian's deteriorating medical condition and the severity of his withdrawal symptoms while detoxifying from opioids;

h.      negligently and carelessly failed to properly respond to Brian's deteriorating medical condition in light of the increasing severity of his withdrawal symptoms while detoxifying from opioids;

i.      negligently and carelessly failed to properly communicate to Advanced Correctional Healthcare medical providers or otherwise arrange for appropriate medical care to report Brian's deteriorating medical condition and the increasing severity of his withdrawal symptoms while detoxifying from opioids;

j.      negligently and carelessly failed to recognize that Brian's deteriorating medical condition, as evidenced by the increasing severity of his withdrawal symptoms while detoxifying from opioids, could not be properly managed outside of a hospital; and

k.      negligently and carelessly failed to properly call for emergency transport or obtain other emergency care for Brian in order for him to

receive timely and necessary treatment as he became critically ill while detoxifying from opioids.

141.    The injuries and death suffered by Brian Downs were proximately caused by the negligence, breach of duty of the standard of care, neglect, default, and /or wilful and wanton conduct of the Defendants as described above.

142.    As a direct and proximate result of Brian Downs' death, his next of kin, have lost and will continue to lose a substantial pecuniary support, consortium, society companionship, and the love and affection of their son and brother, and are entitled to recovery under this Act.

WHEREFORE, Plaintiff prays for judgment as noted below.

### COUNT X
**State Law Claim – Respondeat Superior -
(Morgan County and/or Sheriff Carmody)**

143.    The Morgan County Corrections Defendants and RN Graham were employees and/or agents of Morgan County and Sheriff Carmody, were acting within the scope of his or her employment, and his or her acts or omissions are directly chargeable to his or her employer, the Defendant Morgan County and/or Defendant Sheriff Carmody under state law pursuant to *respondeat superior*.

144.    The Morgan County Defendant RN Graham was an agent or employees of Morgan County and Sheriff Carmody with respect to delivery of healthcare services to inmates of the MCDF, was acting within the scope of her agency or employment with Morgan County and Sheriff Carmody, and her acts or omissions are directly chargeable to her principal, the Defendant Morgan County and Defendant Sheriff Carmody under

state law pursuant to *respondeat superior*.

WHEREFORE, Plaintiff prays for judgment as noted below.

## COUNT XI
### State Law Claim – Respondeat Superior
### (Advanced Correctional Healthcare)

145. The Advanced Correctional Healthcare Medical Defendant, NP Dambacher, was an employee or agent of Advanced Correctional Healthcare. The individually named Advanced Correctional Healthcare Medical Defendant was acting within the scope of her employment or agency with Advanced Correctional Healthcare, and her acts or omissions are directly chargeable to her employer or principal, the Defendant Advanced Correctional Healthcare under state law pursuant to *respondeat superior*.

WHEREFORE, Plaintiff prays for judgment as noted below.

## COUNT XII
### State Law Claim – Indemnification – 745 ILCS 10-9-102
### (Morgan County and/or Sheriff Carmody)

146. Pursuant to §9-102 of the Local Government and Governmental Tort Immunities Act (the Act), a local public entity is directed to pay any tort judgment or settlement for compensatory damages for which it or an employee acting within the scope of his employment is liable. 745 ILCS 10/9-102.

147. Defendant Morgan County and Defendant Sheriff Carmody are local public entities as defined by the Act. 745 ILCS 10/1-106

148. The Morgan County Custodial Defendants and RN Graham at all relevant times were "employees" of the Morgan County Sheriff as defined by the Act. 745 ILCS

10/1-102.

149.    Certain conduct of the individually named Morgan County Corrections Defendants and RN Graham, as described in the Complaint, were willful and wanton as defined in the Act. 745 ILCS 10-1-1-210.

150.    The Morgan County Custodial Defendants and RN Graham acted within the scope of their employment by Morgan County and Sheriff Carmody.

151.    Pursuant to the Act, Morgan County and/or Sheriff Carmody are directly liable for the conduct of the individually named Morgan County Corrections Defendants and RN Graham.

### DAMAGES

152.    The Estate of Brian Downs has sustained the following damages: funeral and burial expenses incurred as a result of decedent's death that have become a charge against his Estate or that were paid on his behalf; loss of prospective net estate accumulations; decedent's conscious pain and suffering and the inherent value of life; pre and post-judgment interest; and loss of earnings of Brian Downs from the date of his death, less lost support of his survivors excluding contributions in kind with interest.

153.    Julie Downs, Brittany Downs, and Brandon Downs, next of kin of Brian Downs, has sustained the following damages: great mental pain, anguish, and suffering from the date of Brian Down's wrongful death and continuing for the remainder of his life; pre and post-judgment interest.

154.    Plaintiff is entitled to attorneys fees and costs pursuant to 42 U.S.C. § 1988.

155.    Plaintiff is entitled to punitive damages

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff seeks judgment as follows:

A.       Compensatory damages from each of the defendants herein.

B.       Punitive damages against the individual defendants or Crossing Healthcare as an entity as allowed by law.

C.       Attorney's fees pursuant to 42 U.S.C. U.S.C. § 1988, and costs of litigation;

D.       Such further relief as the Court deems just and proper.

### COUNT XIII
Downs vs. Respondents in Discovery
(Respondents in Discovery)

The Plaintiff, JULIE DOWNS, as Administrator of the Estate of Brian Downs, and on behalf of his Next of Kin, through her attorneys, CHERRY, FRAZIER & SABIN, LLP, complains against the Respondents in Discovery, The Passavant Memorial Area Hospital Association, d/b/a Jacksonville Memorial Hospital, and Helen D. Kwong, M.D., and in support states as follows:

1.       The Respondent in Discovery, The Passavant Memorial Area Hospital Association, d/b/a Jacksonville Memorial Hospital (JMH), rendered care to Brian Downs during the relevant time period, and it is believed by the Plaintiff that this Respondent is aware of information relevant to the facts alleged in this Complaint and is being names as a Respondent in Discovery pursuant 735 ILCS 5/2-402.

2.       The Respondent in Discovery, Helen D. Kwong, M.D., rendered medical care and treatment to Brian Downs during the relevant period, and it is believed by the Plaintiff that this Respondent has information essential to the determination of who should

properly be named as additional defendants in this action and is being named as Respondent in Discovery pursuant to 735 ILCS 5/2-402.

3.    The Plaintiff, JULIE DOWNS, as Administrator of the Estate of Brian Downs, and on behalf of his Next of Kin, requests Respondent in Discovery Helen D. Kwong, M.D. respond to discovery initiated by the Plaintiff pursuant to the provisions of the applicable Illinois Statutes.

4.    The Plaintiff has attached to this Complaint Plaintiff's Interrogatories and Requests for Production to be answered by the Respondents in Discovery, The Passavant Memorial Area Hospital, d/b/a Jacksonville Memorial Hospital, and Helen D. Kwong, M.D. (See Exhibit A)

WHEREFORE, the Plaintiff, JULIE DOWNS, as Administrator of the Estate of Brian Downs, and on behalf of his Next of Kin, through her attorneys, CHERRY, FRAZIER & SABIN, LLP, requests that this Respondent in Discovery, The Passavant Memorial Area Hospital, d/b/a Jacksonville Memorial Hospital, respond to discovery initiated pursuant to the provisions of the applicable Illinois Statutes.

Respectfully submitted,

Julie Downs, as Administrator of the Estate of Brian Downs, deceased, Plaintiff,

By:    /s/ Richard D. Frazier
       One of Her Attorneys

Richard D. Frazier (6193113)
CHERRY, FRAZIER & SABIN, LLP
Attorneys at Law
1 W. Old State Capitol Plaza, Ste 800
Springfield, IL 62701
Telephone: (217)753-4242 Fax: (217)753-4642
Email: frazier@springfieldlawfirm.com

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JULIE DOWNS, as Administrator of the Estate of BRIAN DOWNS, and on behalf of his Next of Kin, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. |
| COUNTY OF MORGAN, MIKE CARMODY, Morgan County Sheriff, TIM MEGGINSON, Morgan County Jail Administrator, TREVOR PRATHER, Morgan County Assistant Jail Administrator, KURT BORMAN, COLTON BROWN, DYLAN BUNFILL, K.W. CREWS, J. GILL, L. HART, IAN HAYES, ADAM HILLIS, AUSTEN MANLEY, and CLAYTON SEXTON, Morgan County Corrections Officers, | ) ) ) ) ) ) ) ) ) ) | **JURY DEMANDED** |
| ADVANCED CORRECTIONAL HEALTHCARE, INC., JESSICA YOUNG, CEO and as President of Advanced Correctional Healthcare, Inc., and KAREN FOWLER, RN, as Health Services Administrator of Advanced Correctional Healthcare, Inc., MARY DAMBACHER, NP, and DAWN R. GRAHAM, RN, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

_____

| | |
|---|---|
| THE PASSAVANT MEMORIAL AREA HOSPITAL ASSOCIATION, d/b/a JACKSONVILLE MEMORIAL HOSPITAL, HELEN D. KWONG, M.D | ) ) ) ) |
| Respondents in Discovery, | ) |

## PLAINTIFF'S INTERROGATORIES DIRECTED TO RESPONDENT IN DISCOVERY HELEN D. KWONG, M.D.

The Plaintiff, Julie Downs, as Administrator of the Estate of Brian Downs, and on

behalf of his Next of Kin, by her attorneys, CHERRY, FRAZIER & SABIN, LLP, propounds

1

the following interrogatories, to be answered under oath, within twenty-eight (28) days

after service, by Respondent in Discovery, **HELEN D. KWONG, M.D.:**

1.      State your full name, professional and residence addresses, and attach a current copy of your curriculum vitae (CV). In the event you do not have a CV, state in detail your professional qualifications, including your education by identifying schools from which you graduated and the degrees granted and dates thereof, your medical internships and residencies, fellowships and a bibliography of your professional writing(s).

**ANSWER:**

2.      State whether you have held any position on a committee or with an administrative body at any hospital or medical group. If so, state when you had such position(s) and the duties and responsibilities involved in such position(s).

**ANSWER:**

3.      Have you ever been named as a defendant in a lawsuit arising from alleged malpractice or professional negligence? If so, state the court, the caption and the case number for each lawsuit.

**ANSWER:**

4.      Do you know of any statements made by any person relating to the care and treatment of Plaintiff or the damages alleged in the Complaint? If so, give the name and address of each such witness and the date of the statement, and state whether such statement was written or oral and if written the present location of each such statement.

**ANSWER:**

5.      Have you been asked to appear before or attend any meeting of a medical committee or official board of any medical society or other entity for the purpose of discussing care provided to Plaintiff? If so, state the date(s) of each such meeting and the name and address of the committee, society or other entity conducting each meeting.

**ANSWER:**

6.      Have you ever testified in court in a medical malpractice case? If so, state the court, the caption and the case number of each such case, the approximate date of your testimony, whether you testified as a treating physician or expert and whether you testified on your own behalf or on behalf of the defendant or the plaintiff.

**ANSWER:**

7.      Has your license to practice medicine ever been suspended or has any disciplinary action ever been taken against you in reference to your license? If so, state

the specific disciplinary action taken the date of the disciplinary action, the reason for the disciplinary action the period of time for which the disciplinary action was effective and the name and address of the disciplinary entity taking the action.

**ANSWER:**

8.    Do you have any personal recollection of **Brian Downs**? If so, please state the nature of your recollection, as well as any details about **Brian Downs** and/or her care and treatment that you may independently recall.

**ANSWER:**

9.    State the date you first became involved with or in the care of **Brian Downs**.

**ANSWER:**

10.    Explain the nature of your care of **Brian Downs**. Further, state how you first became involved with or in the care of **Brian Downs**.

**ANSWER:**

11.    State the exact dates and places at which you saw **Brian Downs** for the purpose of providing care or treatment.

**ANSWER:**

12.    Were you an employee, agent, servant, shareholder or partner of **The Passavant Memorial Area Hospital Association, d/b/a Jacksonville Memorial Hospital,** at the time of the care or treatment of the **Brian Downs** alleged in the Complaint? If so, state with specificity the nature of each relationship, and the length and dates thereof.

**ANSWER:**

13.    Were you named or covered under any policy or policies of liability insurance at the time of the care and treatment alleged in the complaint? If so, state for each policy:

       (a) The name of the insurance company;
       (b) The policy number;
       (c) The effective policy period;
       (d) The maximum liability limits for each person and each occurrence, including umbrella and excess liability coverage; and
       (e) The named insured(s) under each policy.

**ANSWER:**

14.    Are you incorporated as a professional corporation? If so, state the legal

3

name of your corporation and the names(s) and address(es) for all shareholders.

**ANSWER:**

15.    If you are not incorporated as a professional corporation, state whether you were affiliated with a corporate medical practice, partnership and/or any other corporation in any manner on the date of the occurrence alleged in the complaint. If so, state the name of the corporate medical practice, partnership, or other corporation, the name of your affiliation and the dates of your affiliation.

**ANSWER:**

16.    Identify each and every rule, regulation, by-law or other document of any hospital association, licensing authority, accrediting authority or other private body which you, or your attorneys, may use in defense of the allegations contained in the Complaint.

**ANSWER:**

17.    State whether there were any policies, procedures, guidelines, rules or protocols addressing lab orders and results, healthcare provider communications, and/or discharge decisions, and emergency and/or hospital admission determinations (including but not limited to the medical care of patients in the custody of law enforcement) at **The Passavant Memorial Area Hospital Association, d/b/a Jacksonville Memorial Hospital** during the relevant time period alleged in the Complaint.  If so, state:

      (a) Whether such policies, procedures, opinions, rules or protocols are published and by whom;
      (b) The effective date of said policies, procedures, guidelines, rules or protocols;
      (c) Which medical professionals are bound by said policies, procedures, guidelines, rules or protocols;
      (d) Which medical professionals are bound by said policies, procedures, guidelines, rules or protocols;
      (e) Who is the administrator of any such policies, procedures, guidelines, rules or protocols; and,
      (f) Whether the policies, procedures, guidelines, rules or protocols in effect at the time of the occurrence alleged in the Complaint have been changed, amended or altered after the occurrence. If so, state the change(s) and the date(s) of any such change(s).

**ANSWER:**

18.    Were any photographs, movies and/or videotapes taken of **Brian Downs**? If so, state the date(s) on which such photographs, movies and/or videotapes were taken, who is displayed therein, who now has custody of them, and the name, address, occupation and employer of the person taking them.

4

**ANSWER:**

19.    Have you (or has anyone acting on your behalf) had any conversations with any person at any time with regard to the manner in which the care and treatment alleged in the Complaint was provided, or have you overheard any statement made by any persons at any time with regard to the injuries complained of by the plaintiff or the manner in which the care and treatment alleged in the Complaint was provided? If so, state:

       (g) The date or dates of such conversation(s) and/or statements(s);
       (h) The place of such conversation(s) and/or statement(s);
       (i)  All persons present for the conversation(s) and/or statement(s);
       (j)  The matters and things stated by the person in the conversation(s) and/or statement(s);
       (k) Whether the conversation(s) was oral, written and/or recorded; and
       (l)  Who has possession of the statement(s) if written and/or recorded.

**ANSWER:**

20.    Do you have any information:

       (a) That any plaintiff/plaintiff's decedent was, within the 10 years immediately prior to the care and treatment alleged in the complaint, confined in a hospital and/or clinic, treated by a physician and/or other health professional, or x-rayed for any reason other than personal injury? If so, state the name of each plaintiff so involved, the name and address of each such hospital and/or clinic, physician, technician and/or other health care professional, the approximate date of such confinement or service and state the reason for such confinement or service;

       (b) That any plaintiff/plaintiff's decedent has suffered any serious personal injury and/or illness within 10 years prior to the date of the occurrence? If so, state the name of each plaintiff so involved and state when, where and how he or she was injured and/or ill and describe the injuries and/or illness suffered;

       (c) That any plaintiff/plaintiff's decedent has suffered any serious personal injury and/or illness - since the date of the occurrence? If so, state the name of each plaintiff so involved and state when, where and how he or she was injured and/or ill and describe the injuries and/or illness suffered;

       (d) That any other suit has been filed for any plaintiff/plaintiff's decedent's personal injuries? If so, state the name of each plaintiff involved, the nature of the injuries claimed, the court(s) and caption(s) in which filed, the year(s) filed, and the title(s) and docket number(s) of the suit(s);

       (e) That any claim for workers' compensation benefits has been filed for any plaintiff/plaintiff's decedent? If so, state the name and address of the employer, the date(s) of the accident(s), the identity of the insurance company that paid any such benefits and the case numbers) and

5

jurisdiction(s) where filed.

**ANSWER:**

      21.    List the name and address of all persons (other than yourself and persons heretofore listed) who have knowledge of the facts of the care and treatment complained of in the Complaint filed herein and/or of the injuries claimed to have resulted therefrom.

**ANSWER:**

      22.    When Brian Downs was discharged to the custody of Morgan County Correctional Officers on Friday, April 22, 2022, did you or any other medical provider:

        (a)    Document or otherwise inform the correctional officer(s) that Brian Downs was being discharged against medical advice, or any other similar communication.

        (b)    Document or otherwise state to the correctional officer(s) when Brian Downs was discharged that he was to be immediately returned to the hospital if his symptoms became worse, he had increased confusion, or had persistent vomiting.

        (c)    Did you specifically inform or provide documentation to the correctional officer(s) the information contained in above paragraphs a and/or b.

        (d)    State the name of the correctional officer(s) who were present and had custody of Brian while at the hospital.

        (c)    Did you provide the correctional officer(s) or anyone else a copy of Brian Down's discharge instructions to take with them.

        (d)    Did you instruct the correctional officer(s) to communicate the discharge instructions to jail staff or medical treaters of Brian Downs.

**ANSWER:**

      23.    When Brian Downs' body was returned to the hospital on April 25, 2022, please state whether you or any employee from JMH had any contact with anyone employed by Morgan County or the Morgan County Sheriff's Department . If so, summarize each and every contact or communication.

**ANSWER:**

      24.    State whether you had any communications, whether oral or written, with Plaintiff, Plaintiff's decedent or their family.   If answering in the affirmative, please state the following:

        (a) The date or dates of such conversation(s) and/or statements(s);
        (b) The place of such conversation(s) and/or statement(s);

(c) All persons present for the conversation(s) and/or statement(s);
(d) The matters and things stated by the person in the conversation(s) and/or statement(s);
(e) Whether the conversation(s) was oral, written and/or recorded; and
(f) Who has possession of the statement(s) if written and/or recorded.

**ANSWER:**

25.    Have you retained any expert(s), other than as a "consultant" as that term is defined in Supreme Court Rule 201(b)(3), to testify on your behalf at trial or to assist you in any other way?  If so, for each retained expert, state:

(a) The expert's area(s) of expertise;
(b) The expert's qualifications, including a curriculum vitae and/or resume, if any, and;
(c) The conclusions and/or opinions and bases therefore, including whether written reports have been prepared by the expert(s) and if so, attach copies of the reports.

**ANSWER:**

26.    State whether you were involved with any physical examination of **Brian Downs** at any point from April 22, 2022 through April 25, 2022. If your answer is in the affirmative, please state the time, date, and names of other individuals who were involved in the physical examination of **Brian Downs,** as well as your recollection of the physical examination and/or any actions you took as a result of the examination. If your answer is in the negative, please state why no physical examination of **Brian Downs** was completed in the relevant time period.

**ANSWER:**

27.    Do you remember having any discussions with any nurses, physicians or other healthcare providers regarding **Brian Downs**? If so, identify each conversation, the date, time and persons present, and the subject matter discussed.

**ANSWER**:

28.    Did you or any other medical provider do any follow-up concerning Brian Downs medical condition after he was discharged from the hospital?  If not, what is the reason you failed to do so.  If so, who conducted the follow up, what was learned, and what did you do in response?

**ANSWER:**

29.    State the method(s) of communication used by **The Passavant Memorial Area Hospital Association, d/b/a Jacksonville Memorial Hospital** to share patient information, lab results, etc.

**ANSWER**:

30.    State the method(s) of communication used by healthcare providers who are affiliated with **The Passavant Memorial Area Hospital Association, d/b/a Jacksonville Memorial Hospital** to share patient information with one another.

**ANSWER:**

31.    State what information was communicated to you **The Passavant Memorial Area Hospital Association, d/b/a Jacksonville Memorial Hospital**, or any representative of thereof regarding **Brian Downs** from April 22, 2022, through April 25, 2022, and/or **Brian Downs's** condition from April 22, 2022 through April 25, 2022, and what, if any, actions were taken by you after learning of this information. Further, state the following:

   a. The name of the individual that contacted you;
   b. What date and time you were contacted;
   c. How were you contacted (i.e., in person, by phone, page, etc). If you were contacted by phone, state whether it was your personal phone or office phone; and
   d. State what information was communicated to you.

**ANSWER**:

32.    Were you aware of **Brian Downs**'s lab results during the time period of November 12, 2017 through November 16, 2017? If so, please state the name, title, dates of employment and current address of the individual who informed you, and further state any actions you took as a result of **Brian Downs's** lab results.

**ANSWER:**

33.    Did you speak or otherwise communicate with **any other physician or healthcare provider,** and/or **Dawn R. Graham or Mary Dambacher** at any point between April 22, 2022 through April 25, 2022? If so, please state the nature of the communication, as well as the date, time, location, and method of communication used, as well as what information was communicated.

**ANSWER**:


**DEMAND TO SUPPLEMENT:** Pursuant to Illinois Supreme Court Rule 213(i), you are hereby requested to seasonably supplement the answers to interrogatories as information becomes available.

8

Respectfully submitted,

Julie Downs, as Administrator of the Estate of Brian Downs, deceased, Plaintiff,

By:    /s/ Richard D. Frazier
         One of Her Attorneys

Richard D. Frazier (6193113)
CHERRY, FRAZIER & SABIN, LLP
Attorneys at Law
1 W. Old State Capitol Plaza, Ste 800
Springfield, IL 62701
Telephone: (217)753-4242 Fax: (217)753-4642
Email: frazier@springfieldlawfirm.com

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JULIE DOWNS, as Administrator of the<br>Estate of BRIAN DOWNS, and on behalf of his Next<br>of Kin, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. |
| COUNTY OF MORGAN, MIKE CARMODY,<br>Morgan County Sheriff, TIM MEGGINSON,<br>Morgan County Jail Administrator, TREVOR<br>PRATHER, Morgan County Assistant Jail<br>Administrator, KURT BORMAN, COLTON BROWN,<br>DYLAN BUNFILL, K.W. CREWS,<br>J. GILL, L. HART, IAN HAYES, ADAM<br>HILLIS, AUSTEN MANLEY, and CLAYTON SEXTON,)<br>Morgan County Corrections Officers, | ) ) ) ) ) ) ) )<br><br>) | **JURY DEMANDED** |
| ADVANCED CORRECTIONAL HEALTHCARE,<br>INC., JESSICA YOUNG, CEO and as President<br>of Advanced Correctional Healthcare, Inc., and<br>KAREN FOWLER, as Health Services Administrator<br>of Advanced Correctional Healthcare, Inc.,<br>MARY DAMBACHER, NP, and DAWN R.<br>GRAHAM, RN, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

_____

| | |
|---|---|
| THE PASSAVANT MEMORIAL AREA HOSPITAL<br>ASSOCIATION, d/b/a JACKSONVILLE MEMORIAL<br>HOSPITAL, HELEN D. KWONG, M.D | ) ) ) |
| Respondents in Discovery, | ) ) |

## PLAINTIFF'S REQUESTS TO PRODUCE DIRECTED TO RESPONDENT IN DISCOVERY HELEN D. KWONG, M.D.

The Plaintiff, Julie Downs, as Administrator of the Estate of Brian Downs, and on

behalf of his Next of Kin, by her attorneys, CHERRY, FRAZIER & SABIN, LLP, propounds

1

the following requests to produce, to be answered under oath, within twenty-eight (28)

days after service, by Respondent in Discovery, **Helen D. Kwong, M.D.**:

1. The curriculum vitae of Respondent, including professional education, professional teaching experience, professional work experience and professional publications.

2. All oral or written statements of any witness or party.

3. Any and all communications sent or received by Respondent regarding **Brian Downs** including, but not limited to, communications via pager, text, phone, e-mail.

4. Copies of all articles, treatises, books, rules, regulations, guidelines, by-laws, protocols, or other documents of any association, licensing authority, accrediting authority, inspecting or reviewing authority, public authority or other private body, and other documents which will be used at any depositions or at the trial of this action.

5. Any and all protocols, policies and procedures and all standing medical orders Respondent will reference that were in effect at **The Passavant Memorial Area Hospital Association, d/b/a Jacksonville Memorial Hospital** at the time **Brian Downs** was a patient.

6. Any and all notes, summaries of interviews, findings, determinations, records and documentation pertaining to any mortality or morbidity hearing/meeting regarding the care and treatment of **Brian Downs** alleged in the Complaint and the names and addresses of all individuals involved.

7. All texts and reference materials of any kind in use at **The Passavant Memorial Area Hospital Association, d/b/a Jacksonville Memorial Hospital** during April, 2022, that was available to Respondent.

8. Any and all notes or summaries of interviews with any witness to the occurrence complained of, or any person claiming to have knowledge relating to the occurrence complained of, or the damages alleged to have resulted from said occurrence. If in response to this Request for Production, Respondent claims privilege, preventing the production of documents, Respondent is to complete a privilege log.  The privilege log should state the nature of the privilege, the document for which privilege is claimed, the general nature of the document, when it was written, and who wrote it.

9. Any and all reports, memorandum, files, statements, interview reports, interviews, tape recorded reports or other materials taken or obtained by the risk management department or by agents, independent contractors or employees on behalf of the risk management department of any persons, individuals, employees, and/or non-

employees regarding the incident which is the subject of this litigation. If in response to this Request for Production, Respondent claims privilege, preventing the production of documents, Respondent is to complete a privilege log.  The privilege log should state the nature of the privilege, the document for which privilege is claimed, the general nature of the document, when it was written, and who wrote it.

10. Any and all incident reports and/or accident reports relating to **Brian Downs**. If in response to this Request for Production, Respondent claims privilege, preventing the production of documents, Respondent is to complete a privilege log.  The privilege log should state the nature of the privilege, the document for which privilege is claimed, the general nature of the document, when it was written, and who wrote it.

11. Any notes, diaries, journals, or other materials authored by this Respondent regarding **Brian Downs**.

12. All photographs, slides, motion pictures, radiology films, ultrasound images and/or videotapes taken of **Brian Downs**, or of the procedures complained of or other physical objects involved or of the scene of the alleged occurrence.

13. The entire personnel file and credentialing file for Respondent.

14. Copies of any and all policies, procedures, guidelines, rules or protocols in place at **The Passavant Memorial Area Hospital Association, d/b/a Jacksonville Memorial Hospital** addressing the duties of physicians, including but not limited to, addressing lab orders and results, healthcare provider communications, and/or discharge decisions, and emergency and/or hospital admission determinations (including but not limited to the medical care of patients in the custody of law enforcement at **The Passavant Memorial Area Hospital Association, d/b/a Jacksonville Memorial Hospital** during the time period of April 22, 2022 through April 25, 2022.

15. Any and all contracts or agreements in effect between Respondent and **The Passavant Memorial Area Hospital Association, d/b/a Jacksonville Memorial Hospital** during the time period April 22, 2022 through April 25, 2022.

**DEMAND TO SUPPLEMENT:** Pursuant to Illinois Supreme Court Rule 214, you are hereby requested to seasonably supplement the answers to these requests as information becomes available.

Respectfully submitted,

Julie Downs, as Administrator of the Estate of Brian
Downs, deceased, Plaintiff,

By: /s/ Richard D. Frazier
       One of Her Attorneys

Richard D. Frazier (6193113)
CHERRY, FRAZIER & SABIN, LLP
Attorneys at Law
1 W. Old State Capitol Plaza, Ste 800
Springfield, IL 62701
Telephone: (217)753-4242
Fax: (217)753-4642
Email: frazier@springfieldlawfirm.com

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JULIE DOWNS, as Administrator of the Estate of BRIAN DOWNS, and on behalf of his Next of Kin, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. |
| COUNTY OF MORGAN, MIKE CARMODY, Morgan County Sheriff, TIM MEGGINSON, Morgan County Jail Administrator, TREVOR PRATHER, Morgan County Assistant Jail Administrator, KURT BORMAN, COLTON BROWN, DYLAN BUNFILL, K.W. CREWS, J. GILL, L. HART, IAN HAYES, ADAM HILLIS, AUSTEN MANLEY, and CLAYTON SEXTON, Morgan County Corrections Officers, | ) ) ) ) ) ) ) ) ) ) | **JURY DEMANDED** |
| ADVANCED CORRECTIONAL HEALTHCARE, INC., JESSICA YOUNG, CEO and as President of Advanced Correctional Healthcare, Inc., and KAREN FOWLER, RN, as Health Services Administrator of Advanced Correctional Healthcare, Inc., MARY DAMBACHER, NP, and DAWN R. GRAHAM, RN, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

_____

| | | |
|---|---|---|
| THE PASSAVANT MEMORIAL AREA HOSPITAL ASSOCIATION, d/b/a JACKSONVILLE MEMORIAL HOSPITAL, HELEN D. KWONG, M.D | ) ) ) | |
| Respondents in Discovery, | ) ) | |

**PLAINTIFF'S INTERROGATORIES DIRECTED TO RESPONDENT IN
DISCOVERY THE PASSAVANT MEMORIAL AREA HOSPITAL
ASSOCIATION, d/b/a JACKSONVILLE MEMORIAL HOSPITAL**

The Plaintiff, Julie Downs, as Administrator of the Estate of Brian Downs, and on

1

behalf of his Next of Kin, by her attorneys, CHERRY, FRAZIER & SABIN, LLP, propounds the following interrogatories, to be answered under oath, within twenty-eight (28) days after service, by Respondent in Discovery, **THE PASSAVANT MEMORIAL AREA ASSOCIATION, d/b/a JACKSONVILLE MEMORIAL HOSPITAL (JMH)**

1.     State the full name, title, dates of employment, and address of the person answering and, if different, the full name and address of the individual signing the answers.

**ANSWER:**

2.     Has **JMH** been named as a defendant in a lawsuit alleged malpractice or professional negligence during the 8-year period preceding the filing of this lawsuit? If so, state the court, the caption and the case number for such lawsuit.

**ANSWER:**

3.     Do you know of any statements made by any person relating to the care and treatment of Plaintiff or the damages alleged in the Complaint? If so, give the name and address of each such witness and the date of the statement, and state whether such statement was written or oral and if written the present location of each such statement.

**ANSWER:**

4.     Have you been asked to appear before or attend any meeting of a medical committee or official board of any medical society or other entity for the purpose of discussing care provided to Plaintiff? If so, state the date(s) of each such meeting and the name and address of the committee, society or other entity conducting each meeting.

**ANSWER:**

5.     Have you ever testified in court in a medical malpractice case? If so, state the court, the caption and the case number of each such case, the approximate date of your testimony, whether you testified as a treating physician or expert and whether you testified on your own behalf or on behalf of the defendant or the plaintiff.

**ANSWER:**

6.     Has your license to practice medicine ever been suspended or has any disciplinary action ever been taken against you in reference to your license? If so, state the specific disciplinary action taken the date of the disciplinary action, the reason for the disciplinary action the period of time for which the disciplinary action was effective and the name and address of the disciplinary entity taking the action.

**ANSWER:**

7.      State the date **JMH** first became involved with or in the care of **Brian Downs**.

**ANSWER:**

8.      Explain the nature of **JMH's** care of **Brian Downs**. Further, state how **JMH** first became involved with or in the care of **Brian Downs**.

**ANSWER:**

9.      State the exact dates and places at which physicians or healthcare providers at **JMH** saw **Brian Downs** for the purpose of providing care or treatment.

**ANSWER:**

10.      Were any hearings and/or meetings dealing with mortality or morbidity held at **JMH**  regarding the care and treatment of **Brian Downs** alleged in the Complaint? If so, state the dates of such hearing(s) and/or meeting(s), where such hearing(s) and/or meeting(s) were conducted, who conducted such hearing(s) and/or meeting(s), and whether participation in such hearing(s) and/or meeting(s) was mandatory, further providing a list of attendees for these hearings and/or meeting(s). If in answering Interrogatory Respondent claims privilege, Respondent is to complete a privilege log. The privilege log should state the nature of the privilege, the document(s) for which privilege is claimed, the general nature of the document(s), when it was written, and who wrote it.

**ANSWER:**

11.      Were you named or covered under any policy or policies of liability insurance at the time of the care and treatment alleged in the complaint?  If so, state for each policy:

    (a) The name of the insurance company;
    (b) The policy number;
    (c) The effective policy period;
    (d) The maximum liability limits for each person and each occurrence, including umbrella and excess liability coverage; and
    (e) The named insured(s) under each policy.

**ANSWER:**

3

12.     Is Respondent incorporated as a professional corporation? If so, state the legal name of the corporation and the names(s) and address(es) for all shareholders.

**ANSWER:**

13.     If Respondent is not incorporated as a professional corporation, state whether Respondent is affiliated with a corporate medical practice, partnership and/or any other corporation in any manner on the date of the occurrence alleged in the complaint. If so, state the name of the corporate medical practice, partnership, or other corporation, the name of the affiliation and the dates of the affiliation.

**ANSWER:**

14.     Identify each and every rule, regulation, by-law or other document of any hospital association, licensing authority, accrediting authority or other private body which state or discuss the treatment and/or discharge of patients in custody of law enforcement officials.

**ANSWER:**

15.     State whether there were any policies, procedures, guidelines, rules or protocols addressing lab orders and results, healthcare provider communications, and/or discharge decisions, and emergency and/or hospital admission determinations (including but not limited to the hospital of care in patients in the custody of law enforcement at **The Passavant Memorial Area Hospital Association, d/b/a Jacksonville Memorial Hospital** during the relevant time period alleged in the Complaint.  If so, state:

      (a) Whether such policies, procedures, opinions, rules or protocols are published and by whom;
      (b) The effective date of said policies, procedures, guidelines, rules or protocols;
      (c) Which medical professionals are bound by said policies, procedures, guidelines, rules or protocols;
      (d) Which medical professionals are bound by said policies, procedures, guidelines, rules or protocols;
      (e) Who is the administrator of any such policies, procedures, guidelines, rules or protocols; and,
      (f) Whether the policies, procedures, guidelines, rules or protocols in effect at the time of the occurrence alleged in the Complaint have been changed, amended or altered after the occurrence. If so, state the change(s) and the date(s) of any such change(s).

**ANSWER:**

16.     Were any photographs, movies and/or videotapes taken of Plaintiff's decedent? If so, state the date(s) on which such photographs, movies and/or videotapes were taken, who is displayed therein, who now has custody of them, and the name, address, occupation and employer of the person taking them.

**ANSWER:**

17.     Have you (or has anyone acting on your behalf) had any conversations with any person at any time with regard to the manner in which the care and treatment alleged in the Complaint was provided, or have you overheard any statement made by any persons at any time with regard to the injuries complained of by the plaintiff or the manner in which the care and treatment alleged in the Complaint was provided? If so, state:

(g) The date or dates of such conversation(s) and/or statements(s);
(h) The place of such conversation(s) and/or statement(s);
(i) All persons present for the conversation(s) and/or statement(s);
(j) The matters and things stated by the person in the conversation(s) and/or statement(s);
(k) Whether the conversation(s) was oral, written and/or recorded; and
(l) Who has possession of the statement(s) if written and/or recorded.

**ANSWER:**

18.     Do you have any information:

(a) That any plaintiff was, within the 10 years immediately prior to the care and treatment alleged in the complaint, confined in a hospital and/or clinic, treated by a physician and/or other health professional, or x-rayed for any reason other than personal injury? If so, state the name of each plaintiff so involved, the name and address of each such hospital and/or clinic, physician, technician and/or other health care professional, the approximate date of such confinement or service and state the reason for such confinement or service;

(b) That any plaintiff has suffered any serious personal injury and/or illness within 10 years prior to the date of the occurrence? If so, state the name of each plaintiff so involved and state when, where and how he or she was injured and/or ill and describe the injuries and/or illness suffered;

(c) That any plaintiff has suffered any serious personal injury and/or illness - since the date of the occurrence? If so, state the name of each plaintiff so involved and state when, where and how he or she was injured and/or ill and describe the injuries and/or illness suffered;

(d) That any other suit has been filed for any plaintiff's personal injuries? If so, state the name of each plaintiff involved, the nature of the injuries claimed, the court(s) and caption(s) in which filed, the year(s) filed, and the title(s) and docket number(s) of the suit(s);

(e) That any claim for workers' compensation benefits has been filed for any

5

plaintiff? If so, state the name and address of the employer, the date(s) of the accident(s), the identity of the insurance company that paid any such benefits and the case numbers) and jurisdiction(s) where filed.

**ANSWER:**

19.    List the name and address of all persons (other than yourself and persons heretofore listed) who have knowledge of the facts of the care and treatment complained of in the Complaint filed herein and/or of the injuries claimed to have resulted therefrom.

**ANSWER:**

20.    State whether you had any communications, whether oral or written, with Plaintiff, Plaintiff's decedent or their family.    If answering in the affirmative, please state the following:

(a) The date or dates of such conversation(s) and/or statements(s);
(b) The place of such conversation(s) and/or statement(s);
(c) All persons present for the conversation(s) and/or statement(s);
(d) The matters and things stated by the person in the conversation(s) and/or statement(s);
(e) Whether the conversation(s) was oral, written and/or recorded; and
(f)  Who has possession of the statement(s) if written and/or recorded.

**ANSWER:**

21.    When Brian Downs was discharged to the custody of Morgan County Correctional Officers, on Friday, April 22, 2022, did you or any other medical provider:

(a)    Document or otherwise inform the correctional officer(s) that Brian Downs was being discharged against medical advice, or any other similar statement.

(b)    Document or otherwise state when Brian Downs was discharged that he was going to be immediately returned to the hospital if his symptoms became worse, he had increased confusion, or had persistent vomiting.

(c)    Did you specifically inform the correctional officer the information contained in above paragraphs 1 and/or 2.

(d)    State the name of the correctional officer(s) who were present and had custody of Brian while at the hospital.

(c)    Did you provide the correctional officer(s) or anyone else a copy of Brian Down's discharge instructions to take with them.

(d)    Did you instruct the correctional officer(s) to communicate the discharge instructions to jail staff or medical treaters of Brian Downs.

22.    When Brian Downs' body was returned to the hospital on April 25, 2022, please state whether you or any employee of JMH had any contact with anyone employed by Morgan County or the Morgan County Sheriff's Department.  If so, summarize each and every contact or communication.

**ANSWER:**

23.    Have you retained any expert(s), other than as a "consultant" as that term is defined in Supreme Court Rule 201(b)(3), to testify on your behalf at trial or to assist you in any other way?  If so, for each retained expert, state:

> (a) The expert's area(s) of expertise;
> (b) The expert's qualifications, including a curriculum vitae and/or resume, if any, and;
> (c) The conclusions and/or opinions and bases therefore, including whether written reports have been prepared by the expert(s) and if so, attach copies of the reports.

**ANSWER:**

24.    State whether a complete physical examination of **Brian Downs** was completed at any point from April 22, 2022 through April 25, 2022. If your answer is in the affirmative, please state the time, date, and names of other individuals who were involved in the physical examination of **Brian Downs,** as well as any documentation of the physical examination and/or any actions taken a result of the examination. If your answer is in the negative, please state why no physical examination of **Brian Downs** was completed in the relevant time period.

**ANSWER**:

25.    State the method(s) of communication used by **JMH** to share patient information, lab results, etc.

**ANSWER**:

26.    State what information was communicated to **JMH** by **Helen D. Kwong, M.D.** or any representative of **Helen D. Kwong, M.D.** regarding **Brian Downs** from April 22, 2022 through April 25, 2022, and/or **Brian Downs's** condition from April 22, 2022 through April 25, 2022, and what, if any, actions were taken by you after learning of this information. Further, state the following:

> a. The name of the individual that contacted you;
> b. What date and time you were contacted;
> c. How were you contacted (i.e., in person, by phone, page, etc). If you were contacted by phone, state whether it was your personal phone or office phone; and
> d. State what information was communicated to you.

**ANSWER**:

27.    For the period of April 2022, state the name, version number, and manufacturer of the electronic medical record program utilized by **JMH** in documenting care, treatment and assessments of patients, including, but not limited to, **Brian Downs**.

**ANSWER:**

28.    State the name, title, dates of employment, and current addresses of any and all healthcare providers from **JMH** who were involved with **Brian Downs**'s care from April 22, 2022 through April 25, 2022. To the extent your answer directs Plaintiff to the medical records, not all technicians, nurses, or assistants are included within the records.

**ANSWER**:


**DEMAND TO SUPPLEMENT:** Pursuant to Illinois Supreme Court Rule 213(i), you are hereby requested to seasonably supplement the answers to interrogatories as information becomes available.

Respectfully submitted,

Julie Downs, as Administrator of the Estate of Brian Downs, deceased, Plaintiff,

By:    /s/ Richard D. Frazier
       One of Her Attorneys


Richard D. Frazier (6193113)
CHERRY, FRAZIER & SABIN, LLP
Attorneys at Law
1 W. Old State Capitol Plaza, Ste 800
Springfield, IL 62701
Telephone: (217)753-4242
Fax: (217)753-4642
Email: frazier@springfieldlawfirm.com

8

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JULIE DOWNS, as Administrator of the Estate of BRIAN DOWNS, and on behalf of his Next of Kin, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. |
| COUNTY OF MORGAN, MIKE CARMODY, Morgan County Sheriff, TIM MEGGINSON, Morgan County Jail Administrator, TREVOR PRATHER, Morgan County Assistant Jail Administrator, KURT BORMAN, COLTON BROWN, DYLAN BUNFILL, K.W. CREWS, J. GILL, L. HART, IAN HAYES, ADAM HILLIS, AUSTEN MANLEY, and CLAYTON SEXTON, Morgan County Corrections Officers, | ) ) ) ) ) ) ) ) ) ) | **JURY DEMANDED** |
| ADVANCED CORRECTIONAL HEALTHCARE, INC., JESSICA YOUNG, CEO and as President of Advanced Correctional Healthcare, Inc., and KAREN FOWLER, as Health Services Administrator of Advanced Correctional Healthcare, Inc., MARY DAMBACHER, NP, and DAWN R. GRAHAM, RN, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

_____

| | |
|---|---|
| THE PASSAVANT MEMORIAL AREA HOSPITAL ASSOCIATION, d/b/a JACKSONVILLE MEMORIAL HOSPITAL, HELEN D. KWONG, M.D | ) ) ) ) |
| Respondents in Discovery, | ) |

**PLAINTIFF'S REQUESTS TO PRODUCE DIRECTED TO RESPONDENT IN DISCOVERY THE PASSAVANT MEMORIAL AREA HOSPITAL, d/b/a JACKSONVILLE MEMORIAL HOSPITAL**

1

The Plaintiff, Julie Downs, as Administrator of the Estate of Brian Downs, and on behalf of his Next of Kin, by her attorneys, CHERRY, FRAZIER & SABIN, LLP, propounds the following requests to produce, to be answered under oath, within twenty-eight (28) days after service, by Respondent in Discovery, **THE PASSAVANT MEMORIAL AREA HOSPITAL, d/b/a JACKSONVILLE MEMORIAL HOSPITAL (JMH)**

1. All oral or written statements of all parties given or transferred to some other person or entity other than the attorney for the aforesaid parties.

2. The statement of any other witness, except parties to this action.

3. A copy of the entire table of contents of **JMH's** policy and procedure manual.

4. A complete audit trail of **Brian Downs'** electronic medical records from April 22, 2022 through April 25, 2022, showing when each record was created, and by whom it was created.

5. Any and all protocols, hospital/medical group rules, regulations, by-laws, policy and procedure manuals, guidelines, written by-laws, nurses' rules, doctors' rules, nurses' manuals, doctors' manuals, departmental rules or guidelines, departmental or hospital standards or other similar documents and any and all other written materials which in any way govern or prescribe procedures and standards in effect for addressing, lab orders and results, discharge decisions, physical examinations, diagnostic imaging, and admission determinations.

6. All photographs, movies, radiology films, ultrasound images and/or videotapes taken of **Brian Downs**, including full color reproductions of photographs depicting any pressure sores.

7. Any and all records as to the physical or mental condition in the possession of Respondent relating to **Brian Downs**, including, but not limited to, her complete medical chart, any records pertaining to **Brian Downs** but not contained in her medical chart, any records pertaining to **Brian Downs** provided by any other health care providers, and any other data as to the physical or mental condition of **Brian Downs** prior and subsequent to the alleged occurrence, including, but not limited to:

    (a)    Patient data cover sheet;
    (b)    Nurses' admitting notes;
    (c)    History and physical;
    (d)    Physicians' order sheets;
    (e)    Physicians' progress notes;

2

(f)     Wound care notes;
(g)     Outpatient clinic records;
(h)     Office notes;
(i)     Visiting nurses' records;
(j)     Ambulance records;
(k)     Nurses' medication and/or treatment records;
(l)     Vital signs charts;
(m)     Code blue sheet/CPR method, other records relating to or reflecting any effort at resuscitation;
(n)     Nurses' notes;
(o)     All incident reports;
(p)     Pre-op checklist;
(q)     Surgical consent forms;
(r)     Operative reports;
(s)     Personal property lists;
(t)     Paramedic reports;
(u)     All lab reports, including, but not limited to:
    (1)     Any and all tests of blood or bodily fluid, including, but not limited to, white count, differential, hemoglobin, SED rate;
    (2)     Cultures, bacteriology, epidemiology, anaerobic, aerobic, acid fast, fungal;
    (3)     Blood gasses;
    (4)     Bleeding and clotting time;
    (5)     Blood reactions testing/type and cross match;
    (6)     EMG, EEG, EKG, Echo-ultrasound, Doppler testing;
    (7)     Blood volume;
    (8)     Electrolytes;
    (9)     Fluid input and output;
    (10)     Any and all monitor tracings and other recordings;
    (11)     Other laboratory studies.
(v)     Blood transfusion slips;
(w)     Anesthesia record;
(x)     Any and all X-ray, ultrasound, CAT, CT, MRI or other radiological scans, examinations, studies and reports;
(y)     Any and all consultation reports;
(z)     Discharge summaries;
(aa)     Discharge or transfer instructions or data;
(bb)     Photographs, videotapes;
(cc)     ER records;
(dd)     Pharmacy reports/Unit Dose Control Sheet;
(ee)     Physical therapy sheet notes;
(ff)     Respiratory therapy sheet notes or notes of resuscitation;
(gg)     Hospital bills, insurance forms, records of payment; and
(hh)     Any other records, reports, memoranda, documents, correspondence, etc., pertaining to **Brian Downs**.

3

8.      Any and all protocols, hospital rules, regulations, by-laws, policy and procedure manuals, guidelines, written by-laws, nurses' rules, doctors' rules, nurses' manuals, doctors' manuals, departmental rules or guidelines, departmental or hospital standards or other similar documents and any and all other written materials which in any way govern or prescribe procedures and standards in effect in any of the departments in which **Brian Downs** was treated and discharged during his visits with **JMH.**

9.      Any and all documents that may be used in the impeachment of Plaintiff or any person named by Plaintiff as an expert in this cause.

10.     Blank copies of any and all forms used in the compilation of the medical records of **Brian Downs**.

11.     Any and all notes or summaries of interviews with any witness to the occurrence complained of, or any person claiming to have knowledge relating to the occurrence complained of, or the damages alleged to have resulted from said occurrence.

12.     Any and all documents used or relied upon in the preparation of the answers to the interrogatories in this case.

13.     Any policy of medical liability insurance that the defendant was covered by at the time of care and treatment alleged in the Complaint, including documentation of each policy number, the effective period and the maximum liability limits for each such policy, and for each person and each occurrence and the aggregate amount of coverage of each such policy.

14.     Any and all documents reflecting whether, since the institution of this action, you or any representative of the defendant has been asked to appear before or attend any medical committee, official board of any regulatory agency, medical society, nursing home or hospital for the purpose of discussing this case, and any sanction that was entered against any person as a result of the occurrence complained of.

15.     Any and all documents reflecting or tending to indicate that:

        (a)     **Brian Downs** was, within five years immediately prior to said occurrence, confined in a hospital, treated by a physician or x-rayed for any reason other than personal injury;
        (b)     **Brian Downs** had suffered serious personal injury prior to the date of said occurrence; and/or
        (c)     **Brian Downs** has ever made any claim or filed any other suit for his own personal injuries.

16.     Any oral or written statements, signed or unsigned, transcribed or not, or any

4

memorialization of any statement given or acquired by the defendant or the defendant's agents or attorneys from:

(a)     The Plaintiff, or **Brian Downs**;
(b)     Any person or persons having contact with the plaintiff, **Brian Downs**, or any member of the plaintiff's family;
(c)     Any witness to the occurrence complained of;
(d)     Any person who claims to have knowledge concerning the occurrence complained of;
(e)     Any person who claims to have knowledge concerning the damages claimed to have resulted from the occurrence complained of; and
(f)     Any person who claims to have knowledge concerning any issue in this case.

17.     For each such statement, produce any and all documents reflecting:

(a)     The name, address, employer, title, position, and social security number of each such person or persons;
(b)     The date of each such statement;
(c)     The name, address, employer, title and position of any persons having now or previously having had custody of each such statement; and
(d)     Whether each such statement was written or oral, signed or unsigned, and whether or not transcribed.

18.     Any and all documentation of each drug, medication, treatment, or discharge ordered or administered to the plaintiff, **Brian Downs**, at **JMH**, and, for each such drug, medication, or treatment:

(a)     The specific drug or treatment;
(b)     The dosage of each such drug ordered and/or administered;
(c)     The date and time of each administration of each such drug or treatment; and
(d)     The name, address or last known address, employer, title and position of each doctor or other person ordering such treatment, medication, or discharge.

19.     Any and all documentation of whether any tests or examinations were requested to be performed with respect to **Brian Downs**, including:

(a)     The name, address or last known address, employer, title and position of each doctor or person ordering said test or examination;
(b)     The date and time on which each such request or examination was requested;
(c)     Whether the request was made orally or in writing;
(d)     Whether each such test or examination was performed; and, if so, documentation of:

       (1)    The name, address or last known address, employer, title and position of each person performing each such test or examination;

       (2)    The date and location of each such test or examination;

       (3)    The results of each such test or examination.

  (e)    If any such test or examination was <u>not</u> performed, any and all documentation of the reason(s) why any such test or examination was not performed.

20. Any incident reports and/or accident reports relating to **Brian Downs**. If in response to this Request for Production, Respondent claims privilege, preventing the production of documents, Respondent is to complete a privilege log.  The privilege log should state the nature of the privilege, the document for which privilege is claimed, the general nature of the document, when it was written, and who wrote it.

21. Any and all notes, summaries of interviews, findings, determinations, records and documentation pertaining to any mortality or morbidity hearing/meeting held regarding the care and treatment of the Decedent alleged in Plaintiff's Complaint at Law and the names and addresses of all individuals involved in the root cause analysis. If in responding to this Request Respondent claims privilege, Respondent is to complete a privilege log. The privilege log should state the nature of the privilege, the document(s) for which privilege is claimed, the general nature of the document(s), when it was written, and who wrote it.

22. The entire personnel files, residency files and/or credentialing files for **Helen D. Kwong, M.D.**

23. All texts and reference materials of any kind utilized and available to the physicians at **JMH** in April 2022.

24. Copies of any and all policies, procedures, guidelines, rules or protocols in place at Respondent in Discovery, **JMH**, addressing the duties of physicians, including but not limited to, addressing lab orders and results, healthcare provider communications, and/or discharge decisions, emergency and/or hospital admission determinations (including but not limited to the hospital care of patients in the custody of law enforcement) at **JMH**  during April 22, 2022 through April 25, 2022.

25. Any and all contracts or agreements entered into between **JMH** and **Helen D. Kwong, M.D.** during April 2022.

26. A list giving the names, addresses and specialties of all expert witnesses (other than non-treating, purely consulting experts who are not to testify at trial).

27. For each such witness who may be called to testify at the trial of this cause,

produce all documents reflecting any and all fees that each such witness is expected to charge in this case, and the basis for such fee or charge.

28.    Copies of all articles, treatises, books or other documents which will be used at any depositions or at the trial of this cause.

29.    All reports and documents prepared by any and all experts whom the defendant intends to call at trial.

30.    All articles, papers, treatises, journals, medical literature, and textbooks that the defendant will use during the trial of this action during either direct- or cross-examination.

31.    All rules, regulations, or guidelines of any public or private authority, by-laws, or other documents of any hospital association, licensing authority, accrediting authority, inspecting or reviewing authority, or other private body which you may use in the trial of this action.

32.    The curriculum vitae or professional resume of qualifications of all expert and opinion witnesses with any reports or written memoranda prepared by the expert and opinion witnesses.

33.    Any correspondence, notes, or other writings exchanged between the attorney for the defendant and each witness.

34.    Any and all material, documents, and any other information that each witness has been provided concerning the nature of this case.

35.    An affidavit of the party indicating that production is complete and that all documents have been produced in response to this request.

**It is necessary that the back sides of any and all documents with any writing on the back side also be copied and forwarded to this office.**

**It is further requested that all of the above records be preserved and maintained in their original and unaltered condition.**

**DEMAND TO SUPPLEMENT:** Pursuant to Illinois Supreme Court Rule 214, you are hereby requested to seasonally supplement the response to this Request for Production as information becomes available.

Respectfully submitted,

Julie Downs, as Administrator of the Estate of Brian
Downs, deceased, Plaintiff,

By: /s/ Richard D. Frazier
　　　　One of Her Attorneys

Richard D. Frazier (6193113)
CHERRY, FRAZIER & SABIN, LLP
Attorneys at Law
1 W. Old State Capitol Plaza, Ste 800
Springfield, IL 62701
Telephone: (217)753-4242
Fax: (217)753-4642
Email: frazier@springfieldlawfirm.com